Mike O'CALLAGHAN, Appellant,

and

Jed Whittaker, Robert Gigler, and Alaskan Voters for an Open Primary, Appellants/Intervenors,

v.

STATE of Alaska; Lieutenant Governor Jack Coghill, in his official capacity as Lieutenant Governor, Appellee,

and

Republican Party of Alaska, Appellee/Intervenor.

No. S-6249.

Supreme Court of Alaska.

April 12, 1996.

---

———

Michael O'Callaghan, Anchorage, pro se.

Max F. Gruenberg, Jr., Joan M. Clover, Jennifer L. Holland, Gruenberg & Clover, Anchorage, for Alaskan Voters for an Open Primary.

James L. Baldwin, Assistant Attorney General, Bruce M. Botelho, Attorney General, Juneau, for State of Alaska.

Kenneth P. Jacobus, Anchorage, for Republican Party of Alaska.

Stephan H. Williams, Anchorage, for Amicus Curiae Alaska Federation of Natives.

Edgar Paul Boyko, Edgar Paul Boyko & Associates, Anchorage, for Amicus Curiae Alaskan Independence Party.

Before COMPTON, C.J., and RABINOWITZ, MATTHEWS and EASTAUGH, JJ.

### ORDER

On consideration of the joint emergency request for rehearing (modification of order), filed on March 29, 1996,

IT IS ORDERED:

1. The request for rehearing is GRANTED.

2. Opinion No. 4330, published on March 20, 1996, is WITHDRAWN.

3. Opinion No. 4338 is issued on this date in its place.

Entered by direction of the Court at Anchorage, Alaska on April 12, 1996.

Before RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

### OPINION

MATTHEWS, Justice.

### I. INTRODUCTION

The Alaska Election Code provides for a single "blanket" primary election in which a voter has the right to vote for any candidate, regardless of the party affiliation of the voter or the candidate. AS 15.25.010, et seq. In 1990 the Republican Party of Alaska (RPA) enacted a party rule which provides that only registered Republicans, registered Independents, and registered voters who state no preference of party affiliation may vote "in the Republican primary election...."[1] The question in this case is whether, in light of this rule, the blanket primary violates RPA's freedom of association rights and is thus unconstitutional. We answer this in the negative.

### II. FACTUAL AND PROCEDURAL BACKGROUND

We have previously published an Order and Memorandum Opinion in this case, *O'Callaghan v. Coghill,* 888 P.2d 1302 (Alaska 1995), in which the underlying facts and proceedings are stated. We summarize them briefly here.

After adopting the party rule noted above, RPA sued the State in federal court, challenging the constitutionality of the statutory blanket primary system. *Zawacki v. State,* A92–414 CV (D.Alaska 1992).

United States District Court Judge James Singleton orally announced his tentative decision[2] that under *Tashjian v. Republican*

---

1. Republican Party Rule XIV § 1.

2. Judge Singleton explained his practice of announcing tentative decisions as follows:

 The important thing about a tentative decision is to alert you to the conclusions that I have reached legally and factually after reviewing your materials and the factual materials you have submitted in support of the memorandum.... So, again by announcing tentative decisions I am not suggesting that my mind is fixed in stone or that I am absolutely invulnerable to persuasion but only to suggest to you any factual or legal errors I may be laboring

*Party of Connecticut,* 479 U.S. 208, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986), the blanket primary infringed on RPA's associational rights.[3] Following Judge Singleton's tentative decision the parties stipulated that the lieutenant governor would adopt regulations which would provide for two separate ballots for primary elections.[4] A party rule ballot would contain the names of candidates who filed for the RPA nomination and would be available to Republican, nonpartisan, and undeclared voters. A statutory ballot would contain the names of candidates of all other political parties and would be available to all voters. A voter could vote only one ballot. The 1992 and 1994 primary elections were held under such regulations. *See* 6 AAC 28.100–150.

Mike O'Callaghan, acting without an attorney, filed suit in state superior court challenging the legality of the 1992 primary on the ground that the stipulated regulations were inconsistent with the election statutes. The superior court granted summary judgment in favor of the State.[5] On appeal we ruled that "a stipulation or consent judgment declaring a law unconstitutional is not valid" except in cases of clear unconstitutionality. *O'Callaghan,* 888 P.2d at 1303. We concluded that the standard of clear unconstitutionality had not been met. Further, we found that the briefing was inadequate to determine the constitutionality of the blanket primary and ordered additional briefing. In view of the importance of this case we invited participation by the political parties of Alaska and others. *Id.* at 1305.

O'Callaghan and the State of Alaska submitted supplemental briefs. The State changed its position and now defends the constitutionality of the blanket primary. The court granted RPA's motion to intervene.

Alaskan Voters for an Open Primary (AVOP) were also allowed to intervene. The Alaska Federation of Natives filed an *amicus curiae* brief, and the Alaskan Independence Party filed a submission in lieu of an *amicus curiae* brief. At this point only RPA argues that the blanket primary is unconstitutional, while the other parties defend the blanket primary's constitutionality.

## III. STANDARD OF REVIEW

■ In *Burdick v. Takushi,* 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992), the Supreme Court outlined the approach courts must take in cases in which election laws are challenged as violative of associational and voter rights. The Court noted:

> It is beyond cavil that "voting is of the most fundamental significance under our constitutional structure." ... It does not follow, however, that the right to vote in any manner and the right to associate for political purposes through the ballot are absolute.... The Constitution provides that States may prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives," Art. I, § 4, cl. 1, and the Court therefore has recognized that States retain the power to regulate their own elections.... Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." ...
>
> Election laws will invariably impose some burden upon individual voters. Each provision of a code, "whether it governs

---

under so that in the course of your argument you can correct them.

**3.** The court found that "federal law under the U.S. Constitution substantially · restricts the state's power to ... burden the exercise of the party's administrative rights ... [including] the right to structure the manner in which their political candidates will be selected and to determine who participates in that selection procedure." However, Judge Singleton declined to issue a preliminary injunction, indicating that while the State could be compelled to eliminate

all RPA candidates from the blanket primary, it could not be compelled to implement and pay for a primary designed by RPA.

**4.** The United States District Court entered an order approving the stipulation.

**5.** The State argued that "the challenged regulations are valid because they 'were properly adopted in accordance with a stipulation sanctioned by the United States District Court.'" *O'Callaghan,* 888 P.2d at 1303.

the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends." ... Consequently, to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest, as petitioner suggests, would tie the hands of States seeking to assure that elections are operated equitably and efficiently.... Accordingly, the mere fact that a State's system "creates barriers ... tending to limit the field of candidates from which voters might choose ... does not of itself compel close scrutiny." ...

Instead, ... a more flexible standard applies. A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights." ...

Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." ... But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions....

*Id.* at 433–34, 112 S.Ct. at 2063 (citations omitted).

■ In evaluating interests underlying state election laws "a particularized showing" is not required. *Munro v. Socialist Workers Party,* 479 U.S. 189, 195–96, 107 S.Ct. 533, 537–38, 93 L.Ed.2d 499 (1986):

To require States to prove actual voter confusion, ballot overcrowding, or the presence of frivolous candidacies as a predicate to the imposition of reasonable ballot access restrictions would invariably lead to endless court battles over the sufficiency of the "evidence" marshalled by a State to prove the predicate. Such a requirement would necessitate that a State's political system sustain some level of damage before the legislature could take corrective action. Legislatures, we think, should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively, provided that the response is reasonable and does not significantly impinge on constitutionally protected rights.

## IV. ALASKA'S BLANKET PRIMARY AND VOTER REGISTRATION PATTERNS

A discussion of the constitutionality of state primary elections must begin with an explanation of the three major types of primary election systems. They are the closed primary, the open primary, and the blanket or nonpartisan primary. The defining feature of a closed primary is that only members of a given political party may participate in the party's primary election. Some closed primaries require affiliation with the party for a period of time prior to the primary election, while in others a voter may declare an affiliation at the time of voting in the primary. *Tashjian v. Republican Party of Connecticut,* 479 U.S. 208, 222 n. 11, 107 S.Ct. 544, 553 n. 11, 93 L.Ed.2d 514 (1986). In an open primary, any voter may vote for candidates for any party's nomination, but the voter may only vote for candidates running for one party's nomination. *Id.* In a blanket primary, any voter may also vote for candidates for any party's nomination, but the voter may vote for candidates for the nomination of different political parties for various offices. *Id.* Thus, in Alaska's blanket primary a registered Republican might vote for an Alaskan Independence Party candidate for Governor, a Republican for United

States House of Representatives, and a Democrat for State Senate. In 1986 the United States Supreme Court identified thirty-seven states with closed primaries of one sort or another, nine states with open primaries, and four states, including Alaska, with blanket primaries, called by the Supreme Court "nonpartisan" primaries. *Id.*

The RPA primary conducted under the stipulation in *Zawacki* is referred to by RPA as a "partially-closed primary." This seems apt since the primary is not a classic closed primary in that unaffiliated voters are allowed to participate, yet it does not meet the definition of an open primary, since it is not open to all registered voters.

Under the blanket primary system, Alaska's political parties have no formal role in the selection of candidates for the general election.[6,7] Any person may declare him or herself to be a candidate of a party in the primary election upon meeting certain prescribed legal requirements. The candidate must be "a member of the political party." This, by definition, "means a person who supports the political program of a party." AS 15.60.010(15). The candidate must be registered to vote as a member of the political party under whose name the candidate seeks nomination. AS 15.25.030(a)(16). Registration can be accomplished on the day of the declaration. AS 15.07.040. All the candidates for a given office are listed on a single ballot with their party affiliation. Any voter, regardless of party affiliation, may vote for any candidate. Where there are two or more candidates seeking nomination under a single party's name, the candidate who receives the most votes advances to the general election.[8,9]

The blanket primary was first enacted in Alaska in 1947 following a referendum. Memorandum from Gordon S. Harrison, Director, Legislative Research Agency, Research Request 90.294 (May 23, 1990). The subsequent history of the blanket primary is related by Harrison:

> Increasingly, ... the question of the blanket primary became a partisan issue. Democrats tended to oppose it; Republicans to support it. Democrats believed that it eroded what little party loyalty and discipline existed in Alaska, and they thought the Republicans used it to their advantage by crossing party lines in the primary to elect the weakest Democratic candidate. Republicans supported the blanket primary in hopes that Republican candidates would benefit by attracting conservative Democrats and non-aligned voters.
>
> Despite the overall partisan flavor that the issue was to acquire (with Republicans for and Democrats against the blanket primary), opposition existed on the part of some Republicans, and support existed on the part of some Democrats. In general, party stalwarts and those who believe in the importance of strong parties in the

---

6. There are two exceptions to this. When an incumbent dies or is disqualified before the primary election, or a nominee dies, withdraws, or is disqualified before the general election, ballot vacancies may be filled by party petition. AS 15.25.056, AS 15.25.110.

7. That the Alaska Statutes do not entrust candidate selection to political parties is consistent with the scant attention given political parties in the Alaska Constitution. They are mentioned only twice, both in a limiting context. Art. IV, § 14 (justices and judges may not hold office in a political party); art. XII, § 4 (no person who belongs to any party which advocates the overthrow by force or violence of the government is qualified to hold any public office).

8. Political parties have automatic access to the blanket primary ballot. A political party is defined as "an organized group of voters that represents a political program and that nominated a candidate for governor who received at least three percent of the total votes cast at the preceding general election for governor...." AS 15.60.010(20). In 1992, Alaska had four political parties, RPA, the Democratic Party of Alaska, the Alaskan Independence Party, and the Green Party. The smaller parties sometimes play an important role in Alaska politics. For example, in 1992 the incumbent governor was the nominee of the Alaskan Independence Party.

9. Candidates may gain access to the general election ballot by becoming the nominee of a party in the blanket primary or, in 1992, by petition. AS 15.25.140-.200 (1992). Effective in 1995, candidates of a political "group"—an organization which represents a political program and which does not qualify as a party, AS 15.60.010(19)—may gain access to the blanket primary ballot by petition. AS 15.25.190 (1995).

political process, opposed and continue to oppose the blanket primary. Those who are not firmly aligned with a political party, and who believe that the voter should have maximum independence in balloting matters, support the blanket primary. Party loyalty has not been strong in Alaska, and legislators from both parties have responded to widespread public support for the blanket primary.

In the first session of the first state legislature in 1959, when Democrats firmly controlled both houses and the governor's office, the blanket primary was replaced by the single ballot open primary. Adoption of the comprehensive election code in 1960 incorporated this change.

Republicans led the opposition to the single ballot open primary, although many Democrats also sought a return to the blanket primary. Several bills were introduced to restore the blanket primary, but they languished in Democratic-controlled committees. In 1966, during the second session of the Fourth Legislature, a blanket primary bill passed the House and almost passed the Senate. Senate debate on the measure was reported in the *Anchorage Daily Times*. Democrats Jim Nolan of Wrangell, Robert Blodgett of Teller, and Robert Ziegler of Ketchikan spoke in favor of the bill. Senator Blodgett is quoted saying:

> The Democratic party is a hollow shell. The Republican party is a hollow shell. How many people actually are active workers in the two parties? Darned few. I support the bill.

Senator Ziegler is reported to have said:

> The measure is vitally important to the people of this state. In Ketchikan, probably nine of every ten voters want to vote for the man, not the party.

Despite this bipartisan show of support, the bill failed to pass the Senate.

The general election of 1966 broke the Democratic monopoly on legislative power which had existed since the 1950s: Republican majorities were elected to both Houses and Republican Walter Hickel was elected governor.

The blanket primary was thereupon restored during the first session of the Fifth Legislature. The bill to restore the blanket primary was introduced at the request of Governor Hickel, but it attracted considerable bipartisan support. Among the 35 yeas in the House, nine were cast by Democrats; of the five nays, four were cast by Democrats. In the Senate the bill received 18 yeas, four of which were cast by Democrats. Both nays in the Senate were cast by Democrats.

The blanket primary seems to suit Alaska, where party ties and party organizations are weak. However, some Democratic and Republican party loyalists, who lament the decline of political parties, prefer a more conventional (open or closed) primary that restricts voters to casting ballots for one party's candidates.

*Id.* (footnotes omitted).

In 1994 [10] there were 340,464 registered voters in Alaska. Of these more than 182,000 voters were registered as nonpartisan or undeclared. By contrast, there were 78,212 registered Republicans, 59,782 registered Democrats, 12,936 registered Alaskan Independence Party members, 2,558 Green Party members, and 4,595 "other" party members. Thus approximately fifty-four percent of all registered voters in Alaska were nonpartisan or undeclared, whereas approximately twenty-three percent were registered Republicans and approximately eighteen percent were registered Democrats.

## V. THE MERITS

### A. Relevant Case Law

We turn now to a discussion of the major cases on which the parties rely. Most directly on point from a factual standpoint is *Heavey v. Chapman*, 93 Wash.2d 700, 611 P.2d 1256 (1980). In *Heavey*, the Supreme Court of Washington affirmed the constitutional validity of Washington's blanket primary against a challenge by the State Democratic Central Committee on freedom of association

---

**10.** We quote 1994 figures because they are the figures used by the parties in their briefs. The 1992 figures do not differ significantly in the relative distribution of registered voters.

grounds. The Washington court considered two recent United States Supreme Court cases, *Rosario v. Rockefeller,* 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973) and *Nader v. Schaffer,* 417 F.Supp. 837 (D.Conn.), *aff'd,* 429 U.S. 989, 97 S.Ct. 516, 50 L.Ed.2d 602 (1976). In both of those cases the United States Supreme Court upheld statutes establishing closed primary elections against challenges brought by excluded voters. The *Heavey* court pointed out that these cases did not "establish any mandatory duty that a state must have closed primaries nor do they forbid a blanket primary." 611 P.2d at 1259 (emphasis omitted). The court quoted language from *Nader* which implies that primary systems which permit members of other parties to vote in a party's primary are constitutional: " '[Other states] have provision for primaries which allow participation by independents and members of other parties. There is no suggestion that such a clause makes the election laws unconstitutional....' " *Id.* at 1258 (quoting *Nader,* 417 F.Supp. at 849–50).

While the *Heavey* court found the plaintiffs failed to show a substantial burden to their associational rights, it found that there were compelling interests which supported the blanket primary. It identified three: (1) secrecy—"allowing each voter to keep party identification, if any, secret"; (2) greater voter participation—"allowing the broadest possible participation in the primary election"; and (3) maximizing voter choice—"giving each voter a free choice among all candidates in the primary." *Id.* at 1259.

Subsequent to the Washington Supreme Court's decision in *Heavey* the United States Supreme Court ruled on one aspect of a state's open presidential preference primary in *Democratic Party of the United States v. Wisconsin ex rel. LaFollette,* 450 U.S. 107, 101 S.Ct. 1010, 67 L.Ed.2d 82 (1981). Under Wisconsin's election statute non-Democrats, including members of other parties and independents, were allowed to participate in the Democratic Party presidential candidate preference primary. *LaFollette,* 450 U.S. at 109–10, 101 S.Ct. at 1012–13. Voters did not vote for delegates to the national convention; delegates were chosen at party caucuses.

However, Wisconsin law required that the delegates be bound by the results of the open primary. Democratic National Party rules, on the other hand, required that only closed primaries could bind delegates to vote for a particular candidate. The State of Wisconsin sought a declaration that the Wisconsin delegate selection system was constitutional and binding on the Democratic National Party. The Wisconsin Supreme Court held that the state's system was constitutional and binding on the National Party. *Wisconsin ex rel. LaFollette v. Democratic Party of United States,* 93 Wis.2d 473, 287 N.W.2d 519 (1980), *rev'd,* 450 U.S. 107, 101 S.Ct. 1010, 67 L.Ed.2d 82 (1981). On appeal, the United States Supreme Court defined the issue not as whether Wisconsin might conduct an open primary, but whether "the State may compel the National Party to seat a delegation chosen in a way that violates the rules of the Party." 450 U.S. at 121, 101 S.Ct. at 1018. The Court answered this question in the negative. It held that a state may not control how a national party selects its national convention delegates. *Id.* at 126, 101 S.Ct. at 1021. In so holding, however, the Court acknowledged that the Wisconsin open primary might serve the compelling state interest of encouraging greater voter participation:

> The Wisconsin Supreme Court considered the question before it to be the constitutionality of the "open" feature of the state primary election law, as such. Concluding that the open primary serves compelling state interest by encouraging voter participation, the court held the state open primary constitutionally valid. *Upon this issue, the Wisconsin Supreme Court may well be correct.*

*Id.* at 120–21, 101 S.Ct. at 1018 (emphasis added). Similarly, the Court recited without casting doubt on their validity the interests asserted by the State of Wisconsin as compelling:

> The State asserts a compelling interest in preserving the overall integrity of the electoral process, providing secrecy of the ballot, increasing voter participation in primaries, and preventing harassment of voters. But all those interests go to the conduct of the Presidential preference primary—not

to the imposition of voting requirements upon those who, in a separate process, are eventually selected as delegates. . . .

The State has a substantial interest in the manner in which its elections are conducted, and the National Party has a substantial interest in the manner in which the delegates to its National Convention are selected.

*Id.* at 124–26, 101 S.Ct. at 1020–21 (footnotes omitted).

The case most heavily relied upon by the RPA is *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986). Connecticut had a closed primary. The Republican Party of Connecticut adopted a rule broadening the franchise for Republican Party primaries to include voters who were not registered as members of any other political party. *Tashjian*, 479 U.S. at 210, 107 S.Ct. at 546. The party sought a declaration that the Connecticut closed primary statute violated the party's freedom of association. *Id.* The United States District Court issued such a declaration, which was affirmed by the United States Court of Appeals and by the United States Supreme Court. *Id.* at 211, 107 S.Ct. at 546–47. Thus, the Supreme Court found the closed primary statute unconstitutional. The Supreme Court began its discussion with cautionary language, warning against generalization and prescribing a balancing approach:

> We begin from the recognition that "[c]onstitutional challenges to specific provisions of a State's election laws . . . cannot be resolved by any 'litmus-paper test' that will separate valid from invalid restrictions." *Anderson v. Celebrezze*, 460 U.S. 780, 789 [103 S.Ct. 1564, 1570, 75 L.Ed.2d 547] (1983) (quoting *Storer v. Brown*, 415 U.S. 724, 730 [94 S.Ct. 1274, 1279, 39 L.Ed.2d 714] (1974)). "Instead, a court . . . must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff

seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights." 460 U.S. at 789 [103 S.Ct. at 1570].

*Id.* at 213–14, 107 S.Ct. at 548.

Identifying the nature of the party's interest as one of freedom of association, the Court observed that the Connecticut closed primary statute "places limits upon the group of registered voters whom the Party may invite to participate in the 'basic function' of selecting the Party's candidates." *Id.* at 215–16, 107 S.Ct. at 549 (citing *Kusper v. Pontikes*, 414 U.S. 51, 58, 94 S.Ct. 303, 308, 38 L.Ed.2d 260 (1973)). For a number of reasons, the Court found these limits were not justified by the reasons offered by the State.

First, the Connecticut closed primary did little to prevent "raiding," since under the statute an Independent could re-register as a Republican and vote in the closed primary as late as the day before the primary election.[11] *Id.* at 219, 107 S.Ct. at 551. Second, the closed primary was said to avoid voter confusion since the legislature could determine that " 'it would be difficult for the general public to understand what a candidate stood for who was nominated in part by an unknown amorphous body outside the party, while nevertheless using the party name.' " *Id.* (quoting Brief for Appellant 59). This rationale was found to be inconsistent with the facts since any candidate in the Republican primary had to have received at least twenty percent of the vote at a prior party convention. *Id.* at 220–21, 107 S.Ct. at 551–52. Further, the alleged interest in informed voter decisions, while found to be legitimate, was secondary to the benefit to the party of a broader electorate:

**11.** The Court defined raiding as the practice " 'whereby voters in sympathy with one party designate themselves as voters of another party so as to influence or determine the results of the

other party's primary.' " 479 U.S. at 219, 107 S.Ct. at 551 (quoting *Rosario v. Rockefeller*, 410 U.S. 752, 760, 93 S.Ct. 1245, 1251, 36 L.Ed.2d 1 (1973)).

Given the numerical strength of independent voters in the State, one of the questions most likely to occur to Connecticut Republicans in selecting candidates for public office is how can the Party most effectively appeal to the independent voter? By inviting independents to assist in the choice at the polls between primary candidates selected at the Party convention, the Party rule is intended to produce the candidate and platform most likely to achieve that goal. The state statute is said to decrease voter confusion, yet it deprives the Party and its members of the opportunity to inform themselves as to the level of support for the Party's candidates among a critical group of electors.

*Id.* Finally, the Court stressed that a basic objective of closed primary statutes was to protect parties from external disruption in order to promote responsiveness by elected officials to political parties. The court found this goal to be insubstantial in light of the party's decision that it did not desire such protection:

> The statute in *Storer [v. Brown,* 415 U.S. 724, 736, 94 S.Ct. 1274, 1282, 39 L.Ed.2d 714 (1974)]* was designed to protect the parties and the party system against the disorganizing effect of independent candidacies launched by unsuccessful putative party nominees. This protection, like that accorded to parties threatened by raiding in *Rosario v. Rockefeller* ... is undertaken to prevent the disruption of the political parties from without and not, as in this case, to prevent the parties from taking internal steps affecting their own

process for the selection of candidates. The forms of regulation upheld in *Storer* and *Rosario* imposed certain burdens upon the protected First and Fourteenth Amendment interests of some individuals, both voters and potential candidates, in order to protect the interests of others. In the present case, the state statute is defended on the ground that it protects the integrity of the Party against the Party itself.

*Tashjian,* 479 U.S. at 224, 107 S.Ct. at 553–54.

### B. The Blanket Primary is Not Per Se Unconstitutional

■ The regulations adopted by Alaska's lieutenant governor following the *Zawacki* stipulation appear to assume that the blanket primary statutory system is per se unconstitutional when it conflicts with party rules regarding the selection of political party candidates.[12] Although some commentators have taken a like position,[13] it is not supported by the case law.

*Tashjian* does not confer per se validity on party rules which conflict with a state's primary election laws. Indeed, it disavows any such scope: "Our holding today does not establish that state regulation of primary voting qualifications may never withstand challenge by a political party or its membership." 479 U.S. at 224 n. 13, 107 S.Ct. at 554 n. 13. While *LaFollette* seems to uphold a party rule over a statute, it is distinguishable because the Court did not invalidate the state open primary. The Court in *LaFollette* held that the state could not control the delegate

**12.** 6 AAC 28.100 provides in relevant part: "The purpose of this chapter is to provide a means to implement political party rules that violate AS 15.25.060 (the blanket primary statute), but that must be implemented in accordance with a political party's constitutional associational rights." Similarly, 6 AAC 28.150 provides in relevant part: "The director of elections will implement political party rules regarding selection of political party candidates adopted after 10/23/93 that must be implemented in accordance with a political party's constitutional associational rights...."

**13.** *See, e.g.,* David Lubecky, *Setting Voter Qualifications for State Primary Elections: Reassertion of the Right of State Political Parties to Self–Determination,* 55 U.Cin.L.Rev. 799, 830 (1987)

("When a state political party decides to nominate its candidates for public office in an open or closed primary election contrary to a state law, the fundamental constitutional right of political association mandates that the party's choice of primary form prevail."); Arthur M. Weisburd, *Candidate–Making and the Constitution: Constitutional Restraints on and Protections of Party Nominating Methods,* 57 S.Cal.L.Rev. 213, 281 (1983–84) ("To summarize, statutes compelling parties to choose candidates in primary elections appear to be unconstitutional. The cases make clear that a political association has a first amendment right to determine for itself how it will conduct its affairs. Statutes requiring primaries clearly deny that right.").

selection process of a national party for national conventions. As one commentator has stated:

> One alternative and quite legitimate interpretation bases ... *LaFollette* on principles of federalism and extraterritoriality. On this reading, the reason for permitting the decisions of the national convention to prevail over state laws is that otherwise inconsistent state requirements could make it difficult for the national party to function or act coherently.

Daniel L. Lowenstein, *Associational Rights of Major Political Parties: A Skeptical Inquiry*, 71 Tex.L.Rev. 1741, 1772 (1993).

Furthermore, post-*Tashjian* decisions have not given *carte blanche* authority to political parties to rewrite state primary election rules. For example, in *Lightfoot v. Eu*, 964 F.2d 865 (9th Cir.1992), *cert. denied*, 507 U.S. 919, 113 S.Ct. 1280, 122 L.Ed.2d 673 (1993), the court was presented with an assertion by the Libertarian Party of California that the party was entitled to nominate candidates in contravention of the primary election system mandated by state law. The court rejected this position because it was outweighed by the purpose of the direct primary requirement which was to reduce party influence in favor of that of voters:

> The State justifies the direct primary requirement as a Progressive Era reform designed "to take political nominations out of the smoke-filled rooms of party bosses and give them to the voters." The direct primary was one of several measures conceived of by the Progressives to destroy what they viewed as "the corrupt alliance" between wealthy special interests and the political machine. Richard Hofstadter, *The Age of Reform* 257 (Vintage Books 1955). The Progressives believed democracy should be something greater than competition between political parties. *Id.* at 263. They viewed the direct primary as a vital weapon in their battle to "make government accessible to the superior disinterestedness and honesty of the average citizen. Then, with the power of the bosses broken or crippled, it would be possible to check the incursions of the interests upon the welfare of the people and realize a cleaner, more efficient government." *Id.* at 257. We can imagine no government interest more compelling. Though honest people may debate the success of the direct primary in producing the kind of government the Progressives envisioned, it is a means sufficiently tailored to its ends to satisfy the Constitution. Indeed, if the goal of California's Progressive reformers was to deliver power over the political process from the hands of party bosses and special interests into those of the people, no measure short of the direct primary would be adequate. We therefore hold that the State's interest in enhancing the democratic character of the election process overrides whatever interest the Party has in designing its own rules for nominating candidates.

964 F.2d at 872–73. The court also observed that the "assertion that 'legislative restrictions on the right of a ballot-qualified political party to adopt its own procedures for self-governance including nomination of candidates constitute a substantial impairment of the rights of the party and its members to freedom of association,' " while finding some support, overstated the breadth of the holdings of the cases on which the assertion was based, including *Tashjian* and *LaFollette*. 964 F.2d at 871.

In *Green Party of California v. Jones*, 31 Cal.App.4th 747, 37 Cal.Rptr.2d 406 (1995), the Green Party of California had adopted a rule bestowing upon itself the authority to close the primary election for Green Party candidates as to specified offices. This rule conflicted with the California election code which allowed any qualified member of the party to seek the nomination of the party for any open office. The party asserted the closure right in order to avoid functioning as a "spoiler" in close races between major party candidates. 37 Cal.Rptr. at 410. The court found the Green Party's assertion that it would be injured in its associational interests to be plausible, *id.* at 413, but outweighed by the state's interests "in the uniformity of ballot procedures to prevent voter confusion, to minimize administrative burdens, and to forestall control by party governing bodies." *Id.* at 415.

### C. The State's Interests Justify the Restrictions Imposed on RPA's Rights.

■ RPA claims the right to designate those voters who may vote for Republican candidates in a primary election. The party rule requiring a partially-closed primary election reflects an effort to implement this right. RPA claims that a partially-closed primary advances—and that a blanket primary harms—its interests in two ways. First, it claims that the partially-closed primary is a means by which RPA is able to "protect itself against raiding." Second, RPA contends that the partially-closed primary results in the election of candidates who are more accountable to party "principles and platform" and permit the party "to increase the amount of control [it] would have over elected officials...." [14]

The State and AVOP counter that the harms which RPA identifies are not substantially greater under a blanket primary than they would be under the RPA's partially-closed primary. They point out that under the latter RPA members constitute less than a third of the total eligible voters and thus considerable potential for raiding exists. Further, they note that a voter may change party registration immediately before voting in the partially-closed primary, which also facilitates raiding. [15] The State and AVOP also argue that the loss of candidate accountability to party principles and party direction is not substantially greater under the blanket primary than under the partially-closed primary, given that fewer than a third of the potential voters in the partially-closed primary are RPA members. [16]

In our view there is merit to the State's and AVOP's position that the danger of raid-ing exists under the partially-closed primary and that the danger is potentially increased only by a matter of degree by a blanket primary. Still, it seems plausible that registered voters in other parties might be more apt than independent or nonpartisan voters to vote against an opposing party candidate in a primary for tactical reasons. Further, the partially-closed primary deters raiding in one way that the blanket primary does not. A partisan voter who switches party allegiances just before the election in order to cast a raiding vote must give up the right to vote for candidates of his or her choice in races in which he has no desire to raid.

The Supreme Court, writing in *Tashjian* in 1986, quoted from a study which concluded that "the existence of 'raiding' has never been conclusively proven by survey research." 479 U.S. at 219 n. 9, 107 S.Ct. at 551 n. 9. We have been referred to no studies contradicting this conclusion. However, we believe that at least on a small scale and in some races some opposition party voters will vote for a candidate whom they have no intention of supporting in the general election. [17] Thus we believe that raiding is a legitimate concern, even though its effects may be exaggerated. Further, while raiding is readily possible under either the partially-closed primary or the blanket primary, more raiding is apt to occur in the latter system.

With respect to the second harm, loss of elected officials' accountability to party principles and party control, the State and AVOP's arguments that this loss is only slightly greater with the expanded franchise of the blanket primary seem correct.

Among the reasons offered by the State in support of the blanket primary are that it encourages voter turnout, maximizes voters'

---

**14.** These mirror two of the interests advanced by the State of Connecticut in its effort to defend the closed primary in *Tashjian*, 479 U.S. at 219–21, 107 S.Ct. at 551–52.

**15.** AVOP points to language in *Tashjian* in which the Court observed that a Connecticut statute which permitted re-registration on the day before the primary election facilitated raiding. 479 U.S. at 219, 107 S.Ct. at 551.

**16.** RPA suggests that this case should be remanded for fact finding unless this court rules in RPA's favor. We do not believe that fact finding

is necessary or appropriate in this case. The issues are issues of law; the interests advanced in support of and in opposition to the blanket primary are not especially amenable to courtroom proof and such proof is not, in any case, required. *Munro v. Socialist Workers' Party*, 479 U.S. 189, 195–96, 107 S.Ct. 533, 537–38, 93 L.Ed.2d 499 (1986).

**17.** Of course, some voters will cast primary votes outside their party because they support the candidate for whom they are voting and intend to vote for that candidate in the general election.

freedom of choice among candidates, and tends to ensure that the "officers elected are representative of the people to be governed" in that it "forces the major political parties to have a broad cross-section of support from the voters."[18] These three benefits are seen by the State to have special importance in view of the fact that most voters in Alaska are nonpartisan or undeclared.

The benefits inherent in a blanket primary of greater voter participation and voter free choice among all candidates were recognized by the Washington Supreme Court as compelling in *Heavey*, 611 P.2d at 1259. Voter free choice is better accomplished in a blanket primary than in an open primary:

> [T]he state interest in allowing voters to support the candidates of their choice in a primary can be achieved only by the blanket primary which allows complete voter freedom in alternating votes between parties, since an open primary, on the other hand, restricts a voter to candidates of only one party.

*Id.*

The goal of greater voter participation is one shared by blanket and open primaries.

*See LaFollette*, 450 U.S. at 120–24, 101 S.Ct. at 1018–20.

The objective of ensuring that officers elected are representative of a broad cross-section of the electorate, rather than accountable to the narrower interests which may control a party organization, is in essence the reason for the shift, begun at the turn of the century and now generally prevalent, from nomination by party convention to nomination by direct primary. *See Lightfoot*, 964 F.2d at 872; Note, *Setting Voter Qualifications For State Primary Elections*, 55 U.Cin.L.Rev. 799–800 (1986–87). In Alaska, where a majority of voters are not affiliated with any party, a closed or partially-closed primary system can plausibly be viewed as bestowing on a minority of the electorate a disproportionately powerful role in the selection of public officeholders. If political parties and politically affiliated voters are to have more power in the election process, that is power taken from unaffiliated voters.

Taken individually and collectively these justifications seem to us to be legitimate and

---

**18.** The State's justifications are largely reflected in a resolution passed by the Alaska State Legislature in 1992:

> WHEREAS Alaskans have a proud tradition of freedom and independence and reflect that tradition in the manner in which they exercise their franchise; and
>
> WHEREAS in excess of 55 percent of all registered voters in Alaska have chosen not to affiliate with an organized political party; and
>
> WHEREAS this tradition is reflected in the open primary system that has been used since 1968 and is open to all voters, allowing maximum participation and freedom of choice in the electoral process; and
>
> WHEREAS there has been a national decline in voter registration and participation in the electoral process, particularly among young people who are less likely to identify with political parties; and
>
> WHEREAS forcing voters to vote an exclusively partisan ballot that eliminates the current wide range of choices may discourage them from voting; and
>
> WHEREAS Alaska's primary elections already have significantly lower voter turnout than general elections even under an open unrestricted system of voting and this level will likely be even further reduced by a closed primary; and
>
> WHEREAS the State of Alaska and its agencies have a consistent record of encouraging

voter registration and participation in elections; and

> WHEREAS among the stated goals of closing primaries are strengthening parties and providing greater party discipline, both of which run counter to Alaska voting traditions; and
>
> WHEREAS in the current open election process Alaskans have the option of voting for the person they prefer for each separate office, while a closed primary will limit voters' opportunity to vote for the candidates of their choice; and
>
> WHEREAS there will be a significant added cost to the state to print ballots for each separate party primary;
>
> BE IT RESOLVED that the Alaska State Legislature opposes a change to Alaska's open primary election system and affirms support for maintaining our open primary; and be it
>
> FURTHER RESOLVED that the Alaska State Legislature encourages the governing bodies of the political parties to reconsider their decisions to hold separate closed primaries that force limitations and restrictions on Alaska voters.

1992 Legislative Resolve No. 67 (SCR 30). This resolution was passed unanimously in the Senate, and by a vote of 35 to 5 in the House. 1992 Senate Journal 2143; 1992 House Journal 3169–70.

important. Collectively they outweigh the harms to RPA's associational interests claimed in this case.

It is interesting that the "harm" claimed by RPA of loss of responsiveness of elected officials to party principles and party discipline is much the same as the "benefit" claimed by the State of nominating candidates whose appeal is to a broad cross-section of the electorate. This illustrates that this case reflects in part conflicting visions of democracy. On one side are what one commentator calls "party renewal advocates" whose view is that government works best when elected officials are accountable to party principles and party discipline.[19] On the other are those who agree with the turn-of-the-century Progressives who had a "vision of a democracy purged of corruption by placing widely dispersed power in the hands of common men and women." [20]

Obviously, both visions have strengths and weaknesses, and it is not the function of any court to resolve them. The important point for our purpose is that the Alaska Legislature has taken a position. In so doing it has exercised a power which only it can exercise, and its choice is both reasonable and nondiscriminatory.

## VI. *REMEDY*

■ O'Callaghan seeks a declaration that the 1992 and 1994 primary elections were conducted illegally; prospective relief that requires future primaries to be conducted in accordance with the Alaska Statutes; and a damage remedy under which the State would pay each voter $50 for each of the illegal elections in which the voter participated.

O'Callaghan is entitled to a judgment declaring the 1992 and 1994 primaries to have been illegally conducted. The remedy goes

no further than this. New elections will not be ordered. The acts of officials who were nominated in those primaries will not be invalidated. O'Callaghan is also entitled to prospective mandatory relief requiring that the 1996 primary be conducted in accordance with the Alaska Statutes.[21] The damage remedy which he requests is not supported by any recognized principle of law and will not be afforded.

## VII. *CONCLUSION*

We hold that Alaska's blanket primary statute is constitutional. A state's election statute does not violate the first amendment associational rights of a political party solely by virtue of the fact that the statute conflicts with party rules pertaining to the primary. The blanket primary is nondiscriminatory. While the blanket primary may create some degree of interference with RPA's associational rights, this interference is minor and is justified by the State's interests.

A blanket primary statute may harm the RPA in terms of creating a greater chance of raiding than under a partially-closed primary, though its real effect has not been shown and may not be as extreme as the party argues. Further, there is only a slightly greater loss of accountability of candidates to party principles under the blanket primary as compared to the partially-closed primary. The harm is not great and is justified by the State's interests.

The State's interests in encouraging voter turnout, maximizing voters' choice among candidates, and ensuring that elected officials have relatively broad based constituencies are served by the blanket primary statute. These interests are important and are legitimate objectives for a state to seek to achieve when structuring election procedures.

19. Lowenstein, *supra,* at 1769–70, 1790–91.

20. *Id.* at 1791.

21. The remedy in this case is similar to that afforded in *Coghill v. Boucher,* 511 P.2d 1297, 1304 (Alaska 1973). In *Coghill* we concluded that certain ballot counting regulations were invalid. We remanded with directions for entry of a declaration that the regulations were invalid and an order prohibiting the lieutenant governor

from conducting future elections under the invalid regulations. We particularly noted: "In fashioning appropriate relief for appellants, however, we are not obliged to invalidate the ... election in which ballots were tallied in accordance with [the invalid regulations]." *Id.* In the present case the appellant does not expressly seek to set aside an election. We therefore state no view as to whether or under what circumstances such relief might be available.

We reverse the decision of the superior court granting summary judgment upholding the regulations under which the 1992 primary election was conducted. Having previously rejected the arguments that the challenged regulations should be upheld because of the federal court stipulation or because the blanket primary statute is clearly unconstitutional, we conclude that the blanket primary statute is constitutional and thus the regulations under which the 1992 and 1994 elections were conducted are invalid. A declaratory judgment is entered accordingly. The 1996 primary shall be conducted under the Alaska Statutes. O'Callaghan's damage claim is denied.

REVERSED.

RABINOWITZ, Justice, dissenting.

I dissent from the court's conclusion that the blanket primary statute is constitutional. In my view Alaska's blanket primary statute impermissibly burdens the Republican Party of Alaska's political rights of association in violation of the First and Fourteenth Amendments to the United States Constitution.[1]

Initially I think it appropriate to observe that in accordance with controlling federal precedent this court must apply strict scrutiny in determining the constitutionality of Alaska's blanket primary statute. I rely on *Burdick v. Takushi*, 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992), *Eu v. San Francisco County Democratic Central Committee*, 489 U.S. 214, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989), *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986), and *Democratic Party of the United States v. Wisconsin ex rel LaFollette*, 450 U.S. 107, 101 S.Ct. 1010, 67 L.Ed.2d 82 (1981), in concluding that the compelling interest standard is controlling in resolving issues of federal constitutionality in the factual context of this case.[2]

**1.** Freedom of association has been described by the Supreme Court of the United States as among the preferred rights deemed by implication from the First Amendment's guarantees of speech, press, petition and assembly. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982); *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

*Burdick* contains the most relevant text. There, the Supreme Court wrote:

> [T]he rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. *Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance."* But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions.

*Burdick*, 504 U.S. at 434, 112 S.Ct. at 2063–64 (emphasis added) (citation omitted).

The *Burdick* court applied the latter, lower level of scrutiny, and held the Hawaii election laws to be constitutional. *Burdick* explains its application of the less strict test by stating:

> There is no doubt that the Hawaii election laws, like all election regulations, have an impact on the right to vote, but it can hardly be said that the laws at issue here unconstitutionally limit access to the ballot by party or independent candidates or *unreasonably interfere with the right of voters to associate and have candidates of their choice placed on the ballot.*

*Id.* (emphasis added) (citation omitted).

In the case at bar, the blanket primary statute does specifically interfere with the right of the Republican Party of Alaska to have candidates of its choice placed on the primary ballot. That is, the statute prohibits the Republican Party of Alaska from selecting candidates according to its chosen method. The clear implication of *Burdick* is that Alaska's blanket primary statute is subject to strict scrutiny.

*See also* L. Tribe, American Constitutional Law 101 (2d ed. 1988).

**2.** In reviewing the superior court's interpretation of a constitutional provision, this court applies its independent judgment. *Arco Alaska, Inc. v. State*, 824 P.2d 708, 710 (Alaska 1992).

Equally clear is *Eu.* There, the Supreme Court struck down California laws that barred the parties from endorsing candidates in primary elections. Justice Marshall, writing for the court, stated, "If the challenged law burdens the rights of political parties and their members, it can survive constitutional scrutiny only if the State shows that it advances a compelling state interest and is narrowly tailored to serve that interest." *Eu*, 489 U.S. at 222, 109 S.Ct. at 1019 (citation omitted). He continued:

> It is well settled that partisan political organizations enjoy freedom of association protected by the First and Fourteenth Amendments. Freedom of association means not only that an individual voter has the right to associate with the political party of her choice, but also that a political party has a right to " 'identify the people who constitute the association,' " and *to select a "standard bearer who best represents the party's ideologies and preferences."*

*Eu*, 489 U.S. at 224, 109 S.Ct. at 1020–21 (emphasis added) (citations omitted).

Thus, according to *Eu*, the party has the right to select its own nominee, and any attempt to infringe on that right is subject to strict scrutiny.

*Tashjian* contains similar language. There, Justice Marshall wrote:

> The power to regulate the time, place, and manner of elections does not justify, without more, the abridgment of fundamental rights, such as the right to vote, or, as here, the freedom of political association.

*Tashjian*, 479 U.S. at 217, 107 S.Ct. at 550 (citation omitted). Justice Marshall then applied strict scrutiny to the Connecticut statute, and found it unconstitutional. *LaFollette* also supports this proposition. There the Supreme Court did not specifically state whether strict scrutiny applied. However, it mentions "compelling interest[s]," which implies that strict scrutiny applied to the case. *LaFollette*, 450 U.S. at 124–125, 101 S.Ct. at 1024–25.

To understand why Alaska's blanket primary statute has the effect of prohibiting the Alaskan Republican Party from nominating candidates of its choice, it is necessary to review the operation of Alaska's primary election laws. In this regard AS 15.25.010 states:

> Candidates for the elective state executive and state and national legislative offices *shall* be nominated in a primary election by direct vote of the people in the manner prescribed by this chapter.

(Emphasis added.) Therefore, parties must participate in the primary election. A "political party" is defined as

> an organized group of voters that represents a political program and that nominated a candidate for governor who received at least three percent of the total votes cast at the preceding general election for governor....

AS 15.60.010(20).

Further, parties have no formal control over who can claim the party mantle in a primary. This is because AS 15.25.030, which governs the declaration of candidates, grants the party no role.[3] Specifically, the only formal affiliation which the statute requires between the party and a candidate seeking office under the name of that party is that the candidate "is registered to vote as a member of the political party whose nomination is being sought." AS 15.25.030(a)(16).

Thus, under Alaska law, a party is compelled to participate in the primary election. Furthermore, a party cannot make its own selection of who will represent it in the primary election.[4] Therefore, the primary is the only mechanism available for the party to choose its nominee. And as a result of the

---

**3.** Parties can nominate the candidate of their choice in exceptional circumstances, such as death of the winner of the primary. AS 15.25.110.

**4.** If, for example, only those candidates who received a certain percentage of votes at a party convention or caucus could run in the primary under the party's name, then the party would be assured that the nominees have received at least some affirmative approval from the party. As it stands, the party has no control over which candidates use *its* name.

blanket primary statute, the party cannot select who will vote for its nominee.[5]

Taken together, these laws mandate that any organization which wins more than three percent in the prior election for governor loses the right to nominate the candidate of its choice. A law requiring such a result can only be justified when it is narrowly drawn to advance an interest of compelling importance to the state, according to *Tashjian, Eu,* and *Burdick.* Indeed, in *LaFollette,* the Supreme Court approvingly cited Professor Tribe for the following proposition:

> Freedom of association would prove an empty guarantee if associations could not limit control over their decisions to those who share the interests and persuasions that underlie the association's being.

*LaFollette,* 450 U.S. at 122 n. 22, 101 S.Ct. at 1019 n. 22.

Thus, it is within the province of a party to decide who will nominate its candidates. Other language in the *LaFollette* opinion makes this point, as well. In footnote 25 of the *LaFollette* opinion the Court acknowledges that a party's rules may not necessarily induce party loyalty more effectively than the state's proposed rule. However, "the stringency, and wisdom, of membership requirements is for the association and its members to decide—not the courts—so long as those requirements are otherwise constitutionally permissible."

In my view, *Tashjian* and *LaFollette* compel the holding that Alaska's blanket primary statute is unconstitutional. The Supreme Court of the United States held in *LaFollette*

that the State of Wisconsin could not control the delegate selection process of a national party for national conventions. More particularly, the Supreme Court held that Wisconsin could not force the party to accept a state mandated process for selecting candidates. I cannot distill from *LaFollette* a distinction between the process for selecting delegates and the process for selecting actual candidates. *LaFollette* states, "It is for the National Party—and not the Wisconsin Legislature or any court—to determine the appropriate standards for participation in the Party's *candidate selection process.*" *LaFollette,* 450 U.S. at 124 n. 27, 101 S.Ct. at 1020 n. 27 (emphasis added). Delegates select candidates, and therefore interference in the delegate selection process is interference in the candidate selection process. The Supreme Court recognized this.[6]

In *Tashjian,* the state wanted to keep the candidate selection process closed, while the Party wanted to allow some outsiders to vote. In *LaFollette,* the state wanted to keep the candidate selection process open, while the Party wanted to close the process to outsiders. It is critical to note that, in each case, the Party's desires prevailed over the state's asserted interests in closing or opening the process. I think that these cases cannot be distinguished in any meaningful way from the case at hand, and that they require this court to rule in favor of the Party.

Further, I disagree with the majority's statement that "there is merit to the State's and AVOP's position that the danger of raid-

---

5. The same rules do not apply to non-party "political groups" which run candidates in the primary. AS 15.60.010(19) defines a "political group" as "a group of organized voters which represents a political program and which does not qualify as a political party." Political groups are free to choose their candidates in any way they see fit. If the group then obtains the proper number of signatures on a petition, AS 15.25.140, .160–.170, the candidate is placed on the primary election ballot. AS 15.25.190. Therefore, a political group can nominate its own candidate, since it is not bound by AS 15.25.030(a). Since the group will presumably run a petition drive for only one candidate per office, that candidate will be that group's nominee in the general election. Thus, by having the right to choose who will bear its name in the *primary election,* a group can place a candidate

in the general election without having to tally the opinions of unwanted voters.

I do not address whether a political party is allowed to dissolve itself and reconstitute itself as a political group in order to choose nominees of its own choice.

6. It is true that the Supreme Court recognized that the state had certain interests in providing for an open primary, so long as the political party was not forced to abide by the results. *See LaFollette,* 450 U.S. at 126, 101 S.Ct. at 1021 ("But if Wisconsin does open its primary, it cannot require that the Wisconsin delegates to the National Party Convention vote there in accordance with the primary results, if to do so would violate Party rules.").

ing exists under the partially-closed primary and that the danger is increased only by a matter of degree by a blanket primary." Under the scheme favored by the Republican Party of Alaska, there is little risk of raiding. I say this for two reasons.

First, rules of the Republican Party of Alaska's scheme do not permit raiding for the simple reason that they do not permit Democrats to vote. Under the majority's definition, raiding occurs when "voters in sympathy with one party designate themselves as voters of another party so as to influence or determine the results of the other party's primary." This implies a degree of sabotage, where members of one party try to weaken the other party's position by voting for a weak candidate. The independents and unaffiliated voters who would be allowed to vote under the Republican Party of Alaska's rules are, by definition, not members of an opposing party, and there is no reason to think that they are in sympathy with another party. They do not seek to strengthen unaffiliated or independent candidates by sabotaging the Republican Party of Alaska's nominating process.

Second, the majority's definition of raiding necessarily implies that something is happening to the party that it does not want to happen. Thus, anything that the Republican Party of Alaska wants to happen in its nominating process cannot be characterized as raiding. By virtue of the fact that the Republican Party of Alaska has invited independents and non-affiliated voters to participate in its primary election, actions taken by those voters cannot be considered "raiding." Indeed, had the Republican Party of Alaska invited Democrats to participate in its primary, actions taken by the Democrats could not be fairly characterized as raiding.

The Professor Tribe quote referred to above illustrates this point. Again, he stated:

Freedom of association would prove an empty guarantee if associations could not limit control over their decisions to those who share the interests and persuasions that underlie the association's being.

(Emphasis added.) Thus, associations are guaranteed the right to control who makes their decisions. If they invite non-members to participate, that is their right. And such participation therefore is not "raiding." It should be noted that the quote does not state only that the association should be able to limit control over their decisions to members, but speaks in more general terms of shared interests and persuasions—the precise group the Republican Party of Alaska hopes to attract and include in the primary.

As the Supreme Court of the United States emphasized in *Tashjian*:

The nature of the appellees' First Amendment interest is evident. "It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." The freedom of association protected by the First and Fourteenth Amendments includes partisan political organization.

*Tashjian*, 479 U.S. at 214, 107 S.Ct. at 548 (citations omitted).

In my opinion the State of Alaska has failed to demonstrate compelling state interests which outweigh the harms to the Republican Party of Alaska's constitutionally protected associational rights.[7] The State's objectives of encouraging voter turnout, insuring that elected officials are representative of the people to be governed, and accommodating the need for a broad cross-section of support from voters, cannot trump the Republican Party of Alaska's constitutionally protected associational interests in determining its own candidates, protecting itself against raiding, and insuring that its candidates are accountable to the Republican Party of Alaska's principles and philosophy.

I therefore conclude that since the State has failed to demonstrate compelling reasons

---

7. The Republican Party of Alaska need not defend the efficiency or wisdom of its rules, so long as they are otherwise constitutional. *LaFollette*, 450 U.S. at 123 n. 25, 101 S.Ct. at 1020 n. 25; *cf.* *Smith v. Allwright*, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944) (barring "white primary" as unconstitutional).

for limiting the associational rights of the Republican Party of Alaska, the blanket primary statute is unconstitutional under the First and Fourteenth Amendments to the United States Constitution.[8]

8. Amicus Alaska Federation of Natives points out in its brief that if the current scheme is found unconstitutional, the remedy is not to force the State to run a primary for the Republican Party of Alaska under the Republican Party of Alaska's rules, but instead it is to allow the Republican Party of Alaska to opt out and run its own selection process—caucus, convention, or privately funded statewide primary—so long as the process chosen by the Republican Party of Alaska does not violate constitutional limitations.