*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| SCOTT A. KOHLHAAS, THE ALASKAN INDEPENDENCE PARTY, ROBERT M. BIRD, and KENNETH P. JACOBUS, | ) ) ) ) |
| | ) Supreme Court No. S-18210 |
| | ) |
| | ) Superior Court No. 3AN-20-09532 CI |
| | ) |
| Appellants, | ) O P I N I O N |
| | ) |
| v. | ) No. 7629 – October 21, 2022 |
| | ) |
| STATE OF ALASKA, OFFICE OF LIEUTENANT GOVERNOR, DIVISION OF ELECTIONS, and LIEUTENANT GOVERNOR KEVIN MEYER and DIRECTOR GAIL FENUMIAI, in their official capacities, | ) ) ) ) ) ) ) |
| | ) |
| Appellees, | ) |
| | ) |
| and | ) |
| | ) |
| ALASKANS FOR BETTER ELECTIONS, INC., | ) ) ) |
| | ) |
| Intervenor-Appellee. | ) ) ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Gregory Miller, Judge.

Appearances: Kenneth P. Jacobus, Kenneth P. Jacobus, P.C., Anchorage, for Appellants. Laura Fox, Senior Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney

General, Juneau, for Appellees. Scott M. Kendall, Jahna M. Lindemuth, and Samuel G. Gottstein, Cashion Gilmore & Lindemuth, Anchorage, for Intervenor-Appellee. Craig W. Richards, Law Offices of Craig Richards, Anchorage, and Daniel R. Suhr, Liberty Justice Center, Chicago, Illinois, for Amici Mead Treadwell and Dick Randolph. James E. Torgerson, Stoel Rives LLP, Anchorage, T. Clark Weymouth, Hogan Lovells US LLP, Washington, D.C., and Peter Bautz and Elizabeth Femia, Hogan Lovells US LLP, New York, New York, for Amici Fischer, Richard H. Pildes, and Gary Michael Parsons, Jr. Susan Orlansky and Thomas P. Amodio, Reeves Amodio LLC, Anchorage, and Paul Haughey, Kilpatrick Townsend & Stockton LLC, San Francisco, California, for Amici RepresentUs and FairVote.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

BORGHESAN, Justice.

## I. INTRODUCTION

In 2020 Alaska voters approved, by a slim margin, a ballot initiative that made sweeping changes to Alaska's system of elections. The changes included replacing the system of political party primary elections with a nonpartisan primary election and adopting ranked-choice voting for the general election. A coalition of politically active voters and a political party filed suit, arguing that these changes violate the Alaska Constitution. The superior court ruled otherwise. We considered the appeal on an expedited basis and affirmed the superior court's judgment in a brief order. This opinion explains our reasoning.

Changes to the way elections are run are understandably controversial. No system of elections is perfect, and there are thoughtful policy arguments both for and against the elections system the voters enacted in 2020. It is not our role as a court to

weigh these policy arguments or to consider whether changing the elections system was a good idea. Instead we consider whether the voter-enacted changes are permitted by the Alaska Constitution. As the New York Court of Appeals observed over eighty years ago in upholding changes made to New York City's system of elections: "If the people . . . want to try the system, make the experiment, and have voted to do so, we as a court should be very slow in determining that the act is unconstitutional, until we can put our finger on the very provisions of the Constitution which prohibit it."[1] We conclude that the challengers have not carried their burden to show that the Alaska Constitution prohibits the election system Alaska voters have chosen.

## II. FACTS AND PROCEEDINGS

### A. Facts

On November 3, 2020 Alaska voters approved a ballot initiative entitled "Alaska's Better Elections Initiative" (referred to here as "Initiative 2"). Initiative 2 made three main changes to Alaska's election laws. It repealed the existing system of party primaries in favor of an open primary for state legislative, state executive, and federal congressional offices, with the top four candidates advancing to the general election. It adopted ranked-choice voting for the general election. And it addressed the use of "dark money" in elections by requiring greater disclosures of political fundraising sources. This case concerns only the open primary and ranked-choice voting, not the campaign finance reforms.

---

[1] *Johnson v. City of New York*, 9 N.E.2d 30, 38 (N.Y. 1937).

### 1. Changes to the primary election

Before Initiative 2, Alaska used a system of political party primary elections to determine which candidates for office would advance to the general election.[2] The Alaska Division of Elections oversaw and administered these partisan primary elections.[3] Each political party determined through its bylaws who was eligible to vote in the party's primary election[4] and who was eligible to run as a candidate.[5] The Division established polling places and furnished election supplies.[6] The winner of each party's primary election for a particular elective office — that party's nominee for the office — advanced to the general election.[7]

Aspiring candidates had another path to the general election ballot: submitting a nominating petition with the requisite number of signatures from registered voters.[8] The nominating petition had to include information about the candidate, including the candidate's name and address and the office for which the candidate was

---

[2] Former AS 15.25.010 (2020) (amended Feb. 28, 2021); *see also* former AS 15.25.030 (2020) (amended Feb. 28, 2021) (listing requirements for political party members declaring candidacy in primary election).

[3] *See* AS 15.10.105(a).

[4] *See* former AS 15.25.014 (2020) (repealed Feb. 28, 2021).

[5] *State v. Alaska Democratic Party*, 426 P.3d 901 (Alaska 2018) (upholding superior court overturning "party affiliation rule," effectively permitting political parties to determine who may participate as candidates in primary elections).

[6] Former AS 15.25.060 (2020) (repealed and reenacted Feb. 28, 2021); *see also* former AS 15.15.060 (2020) (amended Feb. 28, 2021).

[7] Former AS 15.25.100 (2020) (repealed and reenacted Feb. 28, 2021).

[8] Former AS 15.25.140 *et seq.* (2020) (repealed Feb. 28, 2021); AS 15.05.010.

running.[9] If the candidate was running for governor, the petition was required to state the name of the lieutenant governor candidate with whom the gubernatorial candidate was running.[10]

Initiative 2 did away with much of this, abolishing state-run partisan primaries and the nominating petition system. Under the new system — called a "jungle primary" by its opponents[11] — the primary election is open to candidates of all parties and those of no party at all.[12] "The primary election does not serve to determine the nominee of a political party or political group but serves only to narrow the number of candidates whose names will appear on the ballot at the general election."[13]

To appear on the primary ballot under Initiative 2 a candidate must file a declaration of candidacy, which must include "the political party or political group with which the candidate is registered as affiliated, or whether the candidate would prefer a nonpartisan or undeclared designation placed after the candidate's name on the ballot."[14] Candidates for governor must list the lieutenant governor candidate with whom they are running, and vice versa.[15]

---

[9] Former AS 15.25.180(a) (2020) (repealed Feb. 28, 2021).

[10] Former AS 15.25.180(a)(17) (2020) (repealed Feb. 28, 2021).

[11] *E.g.*, STATE OF ALASKA, OFFICIAL ELECTION PAMPHLET 106 (2020) (statement by former U.S. Senator Mark Begich and former Alaska Governor Sean Parnell in opposition to Initiative 2).

[12] *See* AS 15.25.030(a)(5).

[13] AS 15.25.010.

[14] AS 15.25.030; AS 15.25.060.

[15] AS 15.25.030(a)(16)-(17).

Each voter receives a single primary ballot and may vote for "any candidate . . . without limitations based on the political party or political group affiliation of either the voter or the candidate."[16] The ballot includes a disclaimer about party affiliation:

> A candidate's designated affiliation does not imply that the candidate is nominated or endorsed by the political party or group or that the party or group approves of or associates with that candidate, but only that the candidate is registered as affiliated with the political party or political group.[17]

The four candidates receiving the greatest number of votes in the primary advance to the general election regardless of party affiliation.[18]

### 2. Changes to the general election

Under the previous general election regime, each voter cast a vote by choosing a single candidate for each office. The total number of votes for each candidate was tallied and the candidate receiving the greatest number of votes was victorious.[19]

Initiative 2 adopts ranked-choice voting — also called "instant-runoff" voting[20] — which permits voters to rank candidates for each office in order of preference and instructs the Division of Elections to tabulate these preferences in a series of

---

[16] AS 15.15.025; AS 15.25.060; AS 15.15.230. While the general election uses ranked-choice voting under Initiative 2, the primary election still uses single-choice voting. AS 15.15.350(c); AS 15.15.025.

[17] AS 15.15.030(14); AS 15.25.060.

[18] AS 15.25.100(a).

[19] *See* former AS 15.25.100 (2020) (repealed and reenacted Feb. 28, 2021); former AS 15.15.350 (2020) (amended Feb. 28, 2021); former AS 15.15.360 (2020) (amended Feb. 28, 2021).

[20] *See* Angela Sbano, *How Should Alaskans Choose?: The Debate Over Ranked Choice Voting*, 37 ALASKA L. REV. 295, 296 n.3 (2020).

rounds.[21] The Division "shall initially tabulate each validly cast ballot as one vote" for the highest-ranked candidate on that ballot.[22] If after this tabulation one candidate has more than half of the votes, voting is complete and that candidate is declared the winner.[23] If no candidate has more than half of the votes, the candidate with the fewest votes is eliminated.[24] Each ballot initially counted for the eliminated candidate is reassigned to that voter's second choice marked on the ballot.[25] If the ballot does not rank a second-choice candidate, it is considered "inactive" and is not counted in further rounds of tabulation.[26] The process repeats until only two candidates remain, when the "tabulation is complete" and the candidate "with the greatest number of votes is elected."[27]

Like the primary election ballot, the general election ballot displays each candidate's political party affiliation or designation as undeclared or nonpartisan.[28] The general election ballot and each polling place must include the same disclaimer about

---

[21]     *See* AS 15.15.350(c)-(e); AS 15.15.360(a)(1).

[22]     AS 15.15.350(d).

[23]     *Id*.

[24]     *Id.*

[25]     AS 15.15.350(d)(2).

[26]     *Id.*; AS 15.15.350(g)(2).

[27]     AS 15.15.350(d).

[28]     AS 15.15.030(5).

party affiliation.[29] The general election ballot must also include a mechanism for voters to write in a candidate for each office.[30]

## B. Proceedings

A coalition of plaintiffs filed suit in December 2020 to challenge the constitutionality of Initiative 2. The plaintiffs are Scott A. Kohlhaas, who is registered with the Libertarian Party of Alaska and ran as a Libertarian candidate for the Alaska House of Representatives and U.S. Senate; Robert M. Bird, the chair of the Alaskan Independence Party; Kenneth P. Jacobus, a registered Republican voter; and the Alaskan Independence Party, a political party. They named as defendants the State of Alaska, Division of Elections; Lieutenant Governor Kevin Meyer, in his official capacity; and Gail Fenumiai, in her official capacity as Director of the Division of Elections. The group Alaskans for Better Elections, Inc., a sponsor of Initiative 2, intervened in defense.

The plaintiffs (referred to collectively as "Kohlhaas" in this opinion) argued that Initiative 2 violated speech rights under the United States and Alaska Constitutions by weakening political parties' ability to select candidates for the general election and by allowing candidates to identify their party affiliation on the ballot without regard to whether the party had nominated or endorsed them.[31] Kohlhaas argued that Initiative 2's

---

[29] AS 15.15.030(14); AS 15.15.060(e).

[30] AS 15.15.030(5). For a write-in vote to be counted, the named candidate must have filed a letter of intent to run as a write-in candidate with the Division of Elections. AS 15.25.105.

[31] U.S. Const. amend. I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."); Alaska Const. art. I, § 5 ("Every person may freely speak, write, and publish on all subjects, being responsible
(continued...)

-8- 7629

approach to pairing candidates for governor and lieutenant governor in the primary election violated the provision of the Alaska Constitution for electing the lieutenant governor.[32] And he argued that Initiative 2's adoption of ranked-choice voting for the general election unconstitutionally burdened the right to vote and violated the provision of the Alaska Constitution providing that the candidate for governor "receiving the greatest number of votes" is victorious.[33]

Kohlhaas, the State, and Alaskans for Better Elections filed cross-motions for summary judgment in April 2021. The superior court held oral argument in July 2021 and, shortly afterward, granted summary judgment in favor of the State and Alaskans for Better Elections. The court rejected Kohlhaas's argument that the new primary system abridged the political parties' freedom of association. The court also rejected Kohlhaas's arguments about electing the governor and lieutenant governor, noting that Kohlhaas failed to meaningfully explain how Initiative 2 violated the pertinent constitutional provisions. And the court rejected Kohlhaas's arguments that ranked-choice voting was unconstitutional because it was too confusing or gave some voters more opportunity to vote than others.

Kohlhaas appealed. We agreed to hear the appeal on an expedited schedule so that prospective candidates and the Division of Elections would know the rules

---

[31]    (...continued)
for the abuse of that right.").

[32]    Alaska Const. art. III, § 8 ("The lieutenant governor shall be nominated in the manner provided by law for nominating candidates for other elective offices. In the general election the votes cast for a candidate for governor shall be considered as cast also for the candidate for lieutenant governor running jointly with him. The candidate whose name appears on the ballot jointly with that of the successful candidate for governor shall be elected lieutenant governor.").

[33]    Alaska Const. art. III, § 3.

governing the upcoming 2022 elections sufficiently far in advance to prepare. After briefing by the parties and amici curiae,[34] we heard argument on January 18, 2022 and issued an order the following day affirming the superior court's grant of summary judgment to the State and to Alaskans for Better Elections.

## III. STANDARDS OF REVIEW

We review summary judgment rulings and questions of constitutional and statutory interpretation, including the constitutionality of a statute, de novo.[35] We give no deference to the superior court's decision and instead "adopt the 'rule of law that is most persuasive in light of precedent, reason, and policy.' "[36]

Kohlhaas bears the burden to establish a constitutional violation: "A presumption of constitutionality applies, and doubts are resolved in favor of constitutionality."[37] "[W]hen constitutional issues are raised, this court has a duty to construe a statute, where reasonable, to avoid dangers of unconstitutionality. Rather than

---

[34] Arguing in favor of Kohlhaas were amici curiae Mead Treadwell and Dick Randolph. Treadwell was Alaska's lieutenant governor from 2011 to 2015 and ran in the Republican primary for governor in 2018. Randolph was an Alaska state representative from 1971-75 and 1979-83 and was the Libertarian Party's gubernatorial candidate in 1982. Amicus briefs supporting the State and intervenors were filed by nonprofits RepresentUs and FairVote and by Alaska Constitutional Convention delegate Victor Fischer and legal scholars Richard H. Pildes and G. Michael Parsons. We thank all amici curiae for their helpful briefing in this case.

[35] *Wielechowski v. State*, 403 P.3d 1141, 1146 (Alaska 2017) (quoting *State v. Ketchikan Gateway Borough*, 366 P.3d 86, 90 (Alaska 2016)).

[36] *Id.* (quoting *Ketchikan Gateway Borough*, 366 P.3d at 90).

[37] *State v. Planned Parenthood of the Great Nw.*, 436 P.3d 984, 992 (Alaska 2019) (quoting *State, Dep't of Revenue v. Andrade*, 23 P.3d 58, 71 (Alaska 2001)).

strike a statute down, we will employ a narrowing construction, if one is reasonably possible."[38]

When this lawsuit was filed, the new elections procedures enacted by Initiative 2 had not been used in any election. Kohlhaas's suit is therefore a facial challenge to these procedures.[39] "We uphold a statute against a facial constitutional challenge if despite . . . occasional problems it might create in its application to specific cases, [it] has a plainly legitimate sweep."[40]

## IV.   DISCUSSION

### A.   Initiative 2 Does Not Violate Political Parties' Associational Rights.

The Alaska Constitution "inherently guarantees the rights of people, *and political parties*, to associate together to achieve their political goals."[41] Kohlhaas's overlapping arguments about these associational rights can be distilled to two: (1) by replacing party primary elections with an open nonpartisan primary election, Initiative 2 harms parties' abilities to choose their nominees; and (2) by allowing candidates to display their party affiliations on the ballot, Initiative 2 forces political parties to

---

[38]     *State v. ACLU of Alaska*, 204 P.3d 364, 373 (Alaska 2009).

[39]     *See Ass'n of Vill. Council Presidents Reg'l Hous. Auth. v. Mael*, 507 P.3d 963, 982 (Alaska 2022) (" 'An as-applied [constitutional] challenge requires evaluation of the facts of the particular case in which the challenge arises,' while a facial challenge means 'that there is no set of circumstances under which the statute can be applied consistent with the requirements of the constitution.' " (alteration in original) (footnote omitted) (first quoting *Dapo v. State, Off. of Child.'s Servs.*, 454 P.3d 171, 180 (Alaska 2019), then quoting *ACLU of Alaska*, 204 P.3d at 372)).

[40]     *Planned Parenthood of the Great Nw.*, 436 P.3d at 991-92 (alterations in original) (quoting *State v. Planned Parenthood*, 171 P.3d 577, 581 (Alaska 2007)).

[41]     *State v. Alaska Democratic Party*, 426 P.3d 901, 906 (Alaska 2018) (emphasis in original).

associate with candidates they may not want to be associated with and permits candidates to lie about their genuine association with the party.

To determine whether election laws place an unconstitutional burden on associational rights, we apply a four-step test described in *State, Division of Elections v. Green Party of Alaska*:

> When an election law is challenged the court must first determine whether the claimant has in fact asserted a constitutionally protected right. If so we must then assess "the character and magnitude of the asserted injury to the rights." Next we weigh "the precise interests put forward by the State as justifications for the burden imposed by its rule." Finally, we judge the fit between the challenged legislation and the state's interests in order to determine "the extent to which those interests make it necessary to burden the plaintiff's rights."[42]

The test is flexible: "[A]s the burden on constitutionally protected rights becomes more severe, the government interest must be more compelling and the fit between the challenged legislation and the state's interest must be closer."[43] "[S]ubstantial burdens require compelling interests narrowly tailored to minimally infringe on the right; modest or minimal burdens require only that the law is reasonable, non-discriminatory, and advances 'important regulatory interests.' "[44] "Alaska's constitution is more protective

---

[42] 118 P.3d 1054, 1061 (Alaska 2005) (footnotes omitted) (quoting *O'Callaghan v. State*, 914 P.2d 1250, 1254 (Alaska 1996)).

[43] *Id.*

[44] *Alaska Democratic Party*, 426 P.3d at 909 (quoting *O'Callaghan*, 914 P.2d at 1254).

of rights and liberties than is the United States Constitution," so a law that passes muster under the U.S. Constitution may not pass muster under Alaska's.[45]

Critical to this analysis are three prior elections cases: our decisions in *Green Party* and *State v. Alaska Democratic Party*[46] and the U.S. Supreme Court's decision in *Washington State Grange v. Washington State Republican Party*.[47]

*Green Party* concerned an Alaska law requiring each political party to have a separate primary election ballot on which only that party's candidates could appear; voters were required to choose just one party's ballot.[48] This law effectively restricted voters to participating in a single party's primary for all elective offices.[49] When the Green Party and Republican Moderate Party asked to share a ballot listing both parties' candidates, the State refused.[50]

Applying the test described above, we recognized that a party's "right to determine who may participate in selecting its candidates — and, if the political party so desires, to seek the input and participation of a broad spectrum of voters — is of central importance to the right of political association."[51] Therefore we held that "political

---

[45]     *Green Party*, 118 P.3d at 1060-61.

[46]     426 P.3d 901.

[47]     552 U.S. 442 (2008).

[48]     118 P.3d at 1058.

[49]     *Id.*

[50]     *Id.*

[51]     *Id.* at 1064; *see also id.* at 1061 n.37 (articulating "right of consenting political parties to determine who may participate in their primaries").

parties have a constitutionally protected associational interest in opening their ballots to voters who would otherwise vote in the primaries of their own political parties."[52]

Next we concluded that a party's right to determine who may participate in its primary was substantially burdened by the rule against combined ballots.[53] Because voters were limited to a single primary ballot, political parties were unable to "appeal to voters who are unwilling to limit their primary choices to the relatively narrow ideological agenda advanced by any single political party."[54] The law "prevent[ed] the political parties themselves from determining who will be allowed to participate" in choosing a nominee, a substantial burden on the parties' associational rights.[55] Finally, combining the last two steps of the test, we found that most of the State's "generalized interests" were too abstract when weighed against the substantial abridgment of associational rights, and that the remaining interests were not closely related to the rule against combined ballots.[56] We held that the law's burden on parties' associational rights was unconstitutional.[57]

---

[52] *Id.* at 1061.

[53] *Id.* at 1065.

[54] *Id.*

[55] *Id.*

[56] *Id.* at 1066-69. The interests put forward to justify the rule were: holding primary elections, complying with U.S. Supreme Court precedent, avoiding ballot overcrowding, requiring a showing of community support from political parties, strengthening parties, preserving political stability, encouraging the two-party system, avoiding voter confusion, and holding orderly and efficient elections. *Id*. at 1066.

[57] *Id*. at 1070.

*Alaska Democratic Party*, decided thirteen years after *Green Party*, involved a similar restriction on political party primaries.[58] The Alaska Democratic Party amended its bylaws to permit registered independent voters to run as candidates in its primary, but state law allowed a candidate to run in a party's primary only if the candidate was registered to vote with that party.[59] The party challenged this law as a violation of its associational rights.[60]

Applying the *Green Party* test, we struck down this party-affiliation rule.[61] First, we concluded that the Democratic Party had asserted a constitutional right "to choose its general election nominees" regardless of party registration.[62] At the second step, we held that the party affiliation rule substantially burdened political parties' associational rights because, like the combined-ballot ban in *Green Party*, it precluded the parties from "appeal[ing] to voters who are unwilling to limit their primary choices to the relatively narrow ideological agenda advanced by any single political party."[63] And again combining the third and fourth steps, we concluded that the State's asserted interests were either not advanced by the law or that the law was not narrowly tailored to achieve those interests.[64]

---

[58]    426 P.3d 901 (Alaska 2018).

[59]    *Id.* at 905-06.

[60]    *Id.* at 906.

[61]    *Id.* at 907.

[62]    *Id.* at 908-09.

[63]    *Id*. at 909-10 (quoting *State, Div. of Elections v. Green Party of Alaska*, 118 P.3d 1054, 1061 (Alaska 2005)).

[64]    *Id.* at 911-15.  The State's asserted interests were:  (1) ensuring sufficient
(continued...)

The U.S. Supreme Court's decision in *Washington State Grange* concerned a facial challenge to a Washington voter initiative enacting a primary election process similar to Initiative 2: an open primary in which the top two candidates advanced to the general election regardless of party affiliation.[65] The election regulations there, like Initiative 2, provided that the primary did not select political parties' nominees but instead narrowed the number of candidates who would proceed to the general election.[66] The political parties challenging the law argued that the initiative "allow[ed] primary voters who are unaffiliated with a party to choose the party's nominee" because candidates progressing to the general election "[would] become the de facto nominees of the parties they prefer, thereby violating the parties' right to choose their own standard bearers."[67] The Court rejected this argument because the primary established by Washington's initiative "[did] not, by its terms, choose parties' nominees."[68] Noting that "[t]he law never refer[red] to the candidates as nominees of any party, nor . . .treat[ed]

---

[64]    (...continued)
public support for political parties; (2) ensuring sufficient public support for political candidates; (3) preventing voter confusion; and (4) promoting political stability. *Id.* at 911.

[65]    552 U.S. 442, 447-48 (2008).

[66]    *Compare id.* at 453 ("[T]he primary 'does not serve to determine the nominees of a political party but serves to winnow the number of candidates to a final list of two for the general election.' " (quoting WASH. ADMIN. CODE § 434-262-012 (emergency regulation )), *with* AS 15.25.010 ("The primary election does not serve to determine the nominee of a political party or political group but serves only to narrow the number of candidates whose names will appear on the ballot at the general election.").

[67]    *Wash. State Grange*, 552 U.S. at 452-53.

[68]    *Id*. at 453.

them as such," the Court determined that "[t]he essence of nomination — the choice of a party representative — d[id] not occur under" the law.[69] The Court explained that "[w]hether parties nominate their own candidates outside the state-run primary is simply irrelevant" and that, with the repeal of Washington's prior laws governing party nominations, parties could nominate candidates "by whatever mechanism they choose."[70]

Similar to Alaska's Initiative 2, the Washington initiative required candidates to designate on the ballot a "party preference."[71] The parties argued that allowing candidates to state a party preference on the ballot amounted to an unconstitutional forced association because voters would assume these candidates were the designated parties' nominees.[72] The Court dismissed this argument as "sheer speculation" that "depend[s] . . . on the possibility that voters will be confused as to the meaning of the party-preference designation."[73] Describing ways in which election administrators and political parties could reduce the risk of voter confusion — such as placing a disclaimer on the ballot or educating the public about the meaning of a candidate's stated party preference — the Court concluded that mere speculation about voter confusion was not enough to sustain a facial challenge to the law.[74]

---

[69]    *Id*.

[70]    *Id*.

[71]    *Id*. at 444, 453 n.7.

[72]    *Id*. at 454.

[73]    *Id.*

[74]    *Id*. at 456-57 ("Each of their arguments rests on factual assumptions about voter confusion, and each fails for the same reason:  In the absence of evidence, we cannot assume that Washington's voters will be misled.").

We consider the arguments made by Kohlhaas and the Treadwell and Randolph amici ("Treadwell amici") in light of these precedents.

### 1. Kohlhaas has asserted a constitutionally protected right.

The first step of the test is to determine whether Kohlhaas has asserted a constitutionally protected right. Kohlhaas argues that Initiative 2's nonpartisan primary affects parties' rights "to determine who may participate in choosing their candidates" and to actually choose the party's nominees. The Treadwell amici focus on the latter right but frame it differently, arguing that by allowing candidates to list their party registration on the ballot, Initiative 2 forces parties "to accept non-members as their representatives running under their banners." In other words, the Treadwell amici argue, political parties have a right against forced association that Initiative 2 burdens. The State concedes that Kohlhaas's claim "arguably" meets the first step of this Court's balancing test. Alaskans for Better Elections does not concede this point, arguing that Kohlhaas seeks to "invent a new state constitutional right allowing parties to designate their preferred candidates on the ballot."

Kohlhaas and the Treadwell amici have asserted constitutionally protected rights. A political party's "right to determine who may participate in selecting its candidates — and, if the political party so desires, to seek the input and participation of a broad spectrum of voters — is of central importance to the right of political association."[75] So too is a political party's right to choose its standard bearer.[76] The flip

---

[75] *State, Div. of Elections v. Green Party of Alaska*, 118 P.3d 1054, 1064 (Alaska 2005).

[76] *See Wash. State Grange*, 552 U.S. at 453 (describing "the special place the First Amendment reserves for, and the special protection it accords, the process by which a political party 'select[s] a standard bearer who best represents the party's ideologies and preferences' " (quoting *Cal. Democratic Party v. Jones*, 530 U.S. 567, 575 (2000)));

(continued...)

side of a party's right to choose a standard bearer is the right *not* to be forced to accept a candidate the party does not want.[77] Kohlhaas and the Treadwell amici invoke these rights. Whether Initiative 2 *actually burdens* those rights, and if so to what degree, are different questions addressed at the second stage of the *Green Party* test.

**2. Initiative 2 places a minimal burden on political parties' associational rights.**

**i. The nonpartisan open primary does not burden a party's ability to choose its standard bearer.**

Kohlhaas contends that Initiative 2's nonpartisan primary burdens parties' associational rights because it diminishes their control over the primary election.[78] But

---

[76] (...continued)
*State v. Alaska Democratic Party*, 426 P.3d 901, 909 (Alaska 2018) (describing political party's "associational right to choose its general election nominees"). Our description of the constitutional right implicated in *Alaska Democratic Party* should be understood within the context of the electoral system in which the case was decided. *See* former AS 15.25.100 (2020) (repealed and reenacted Feb. 28, 2021). Within that system, which advanced the winner of each political party's primary to the general election, we decided that the Alaska Constitution protects a political party's right to choose its general election nominee, *Alaska Democratic Party,* 426 P.3d at 909, akin to the U.S. Supreme Court's ruling that the First Amendment protects a party's right to choose its "standard bearer." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 359 (1997) ("[T]he New Party, and not someone else, has the right to select the New Party's 'standard bearer.' "). We did not hold, as the question was not presented, that a political party has a right to have the nominee of its choice actually advance to the general election regardless of how the primary election is structured. Kohlhaas and the Treadwell amici do not assert that a political party has such a right.

[77] *See Wash. State Grange*, 552 U.S. at 452-55 (recognizing parties' right against being compelled to associate with candidates they do not endorse but concluding that Washington election regulations did not compel association).

[78] Kohlhaas also argues that Initiative 2 "harms the right of a minor political party to exist at all." To be designated as a political party under Alaska law, a party must
(continued...)

-19-                                                        7629

political parties do not have a right to control the State's primary elections. They have a right to associate in order to nominate preferred candidates, but as *Washington State Grange* makes clear and even Kohlhaas concedes, political parties do not have a right to a State-run nominating process.[79]

Initiative 2's nonpartisan open primary places no burden on political parties' associational rights precisely because it decouples the State's election system from political parties' process of selecting their standard bearers. In *Alaska Democratic Party* and *Green Party* we struck down laws that restricted a political party's right to choose its standard bearer and to determine who could participate in making that choice.[80] Initiative 2 is the polar opposite of these laws: it places no restrictions on how political parties go about choosing their standard bearers. Previously, political parties were forced to hold a primary election under rules passed by the legislature and

---

[78]  (...continued)
have a number of registered voters equal to at least 3% of total votes cast for governor in the previous general election (or U.S. senator if no gubernatorial race was held, followed by U.S. representative if no senatorial race was held). AS 15.80.010(27). Before Initiative 2, groups could also achieve party status if their nominated candidate received at least 3% of the total votes cast in the election. Former AS 15.80.010(27) (2020) (amended Feb. 28, 2021). Removing the latter option, Kohlhaas argues, "eliminated the only reasonable method of qualifying a party in Alaska" because the registered-voters threshold is too high for a minor party to meet. Because Kohlhaas raises this argument — which would seem to require significant factual development — for the first time on appeal, it is waived and we do not consider it. *See Beach v. Handforth-Kome*, 314 P.3d 53, 57 n.10 (Alaska 2013).

[79]  552 U.S. at 453. Kohlhaas conceded this point before the superior court, too, agreeing that "there is no legal requirement that the State pay for primary elections to select party candidates."

[80]  *Alaska Democratic Party,* 426 P.3d at 907; *Green Party*, 118 P.3d at 1064-65.

administered by the Division of Elections.[81]  Now they can select their preferred candidate through whatever mechanism they desire and are under no obligation to allow participation by voters they do not want.  If a political party would like to choose the candidate that best represents its platform by primary election, caucus, or straw poll, it is entirely free to do so.[82]  The party can then throw whatever support it can muster behind that candidate's election bid.  The parties' nomination process stands apart from the primary election, which serves merely to winnow the field of candidates to a manageable number for the general election.

In this way Initiative 2 is much like the law at issue in *Washington State Grange*.[83]  The U.S. Supreme Court rejected the argument that this kind of primary system violated political parties' associational rights by making the victorious primary

---

[81]     Former AS 15.25.010 (2020) (amended Feb. 28, 2021).

[82]     Kohlhaas argues that parties cannot afford to run their own primary elections and will be forced to resort to nominating candidates in " 'smoke-filled' rooms."  But Kohlhaas does not explain how this is any more than a policy consideration.  Kohlhaas also argues that Initiative 2 infringes on the Alaskan Independence Party's rules, which "provide that their candidates are to be selected by Party convention," and that the Independence Party "does not desire the election mandated by [Initiative] 2."  He also argues that the Republican Party bylaws provide for a separate primary election.  But Initiative 2 is compatible with party rules:  under the law, parties may select nominees by whatever mechanism they wish.

[83]     *Compare Wash. State Grange*, 552 U.S. at 453 (upholding Washington primary election that "does not serve to determine the nominees of a political party but serves to winnow the number of candidates to a final list of two for the general election" (quoting WASH. ADMIN. CODE § 434-262-012 (emergency regulation))), *with* AS 15.25.010 ("The primary election does not serve to determine the nominee of a political party or political group but serves only to narrow the number of candidates whose names will appear on the ballot at the general election.").

candidates "the de facto nominees of the parties they prefer."[84]   Instead, the Court explained, "[t]he essence of nomination — the choice of a party representative — does not occur under [the law]."[85]   The same is true for Initiative 2.

The Treadwell amici correctly note that the Alaska Constitution is more protective of rights than the U.S. Constitution and argue that we should not follow *Washington State Grange*.  They argue we should scrutinize the constitutional burden more closely.  But looking more closely cannot reveal something that does not exist.  Because Initiative 2 takes the State out of the party nominating process entirely, it places no burden on political parties' right to choose a standard bearer or on their right to determine who can participate in making that choice.[86]

> ### ii.    Kohlhaas fails to show that displaying candidates' party registration on the ballot forces unwanted association upon political parties.

Kohlhaas insists that allowing candidates to designate a party on the ballot violates political parties' associational rights because it "force[s] the political parties to accept those candidates that they may or may not want . . . and allows the candidates to identify themselves (truthfully or falsely) or hide their beliefs."  Kohlhaas also faults Initiative 2 for not allowing the parties to indicate their nominees on the ballot.[87]  These

---

[84]    *Wash. State Grange*, 552 U.S. at 452-53.

[85]    *Id.* at 453.

[86]    Kohlhaas argues that Initiative 2 "prevent[s] public participation."  Yet nothing in the Initiative prevents a political party from holding its own primary election or nominating convention and opening it to whatever members of the public it desires.  And all registered voters may participate in the State-run nonpartisan primary. AS 15.15.025; *see also* AS 15.05.010.

[87]    Despite making this argument on appeal, Kohlhaas conceded to the superior
(continued...)

rules, Kohlhaas argues, will result in forced association: Voters, seeing on the ballot that a candidate is registered with a particular political party, will believe that the party supports that candidate and that the candidate supports that party's platform.

Kohlhaas's assertion that a candidate can lie about party affiliation on the ballot is incorrect. A candidate may appear on the ballot as affiliated with a political party only if that candidate truly has registered with the Division of Elections as affiliated with that party.[88] The ballot and polling places must include a disclaimer explaining that these designations mean "only that the candidate is registered as affiliated with the political party."[89] A candidate who is registered with one party can choose to be designated as nonpartisan or undeclared, but may not be listed on the ballot as registered with another party.[90] Candidates not registered with a political party may be designated only as nonpartisan or undeclared.[91] Thus, candidates cannot lie about being affiliated with a particular party.

Theoretically, a candidate could register with a political party whose beliefs that candidate did not share to "usurp[] the party label as an election tactic," as Kohlhaas puts it. A candidate's registration with a party certainly suggests that the candidate supports at least some of the party's platform. But that is not what the ballot says; it presents only the fact that the candidate has registered as affiliated with the party. The ballot does not suggest that the party endorses the candidate. To the contrary, the ballot

---

[87]    (...continued)
court that political parties do not have the right to identify their nominees on the ballot.

[88]    AS 15.25.030(a)(5); AS 15.15.030(5).

[89]    AS 15.15.030(14); AS 15.15.060(e).

[90]    *See* AS 15.15.030(5).

[91]    *Id.*

expressly disclaims any such endorsement.[92] And parties can warn voters about Trojan horse candidates — those who might run under a party's banner but do not share the party's values.[93]

Just as the U.S. Supreme Court emphasized in *Washington State Grange* its "faith in the ability of individual voters to inform themselves about campaign issues,"[94] we have also recognized that Alaska voters are not easily fooled.[95] Kohlhaas's claim of associational harm presupposes that Alaskans will assume that a candidate's statement of affiliation with a party means that the party endorses or approves of that candidate. But most people know that in politics, as in most areas of life, affection is not always a two-way street. To reinforce that point, Alaska's ballots and polling places must include a disclaimer that a candidate's statement of party affiliation is not a

---

[92]     AS 15.15.030(14).

[93]     As Alaskans for Better Elections points out, under the pre-Initiative 2 system candidates' party affiliation was printed after their names on the ballot. Former AS 15.15.030(5) (2020) (amended Feb. 28, 2021). Thus candidates have always been able to register with a political party whose beliefs they do not share as a tactic to win elections. Initiative 2 changes nothing in that regard.

[94]     *Wash. State Grange,* 552 U.S. 442, 454 (2008) (quoting *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 220 (1986)).

[95]     *State v. Alaska Democratic Party*, 426 P.3d 901, 913 (Alaska 2018) (holding that concerns about voter confusion from descriptors like "nonpartisan" or "undeclared" "underestimate . . . Alaska voters' common sense"); *State of Alaska, Div. of Elections v. Green Party of Alaska*, 118 P.3d 1054, 1068 (Alaska 2005) ("[W]e see no basis for predicting that Alaska voters might be incapable of understanding combined ballots. . . . We are . . . confident that Alaska voters would have little trouble understanding and choosing between combined ballots.").

statement of approval or endorsement by the party.[96] With this safeguard, and with our confidence in Alaska voters' common sense, we cannot presume that voters will misinterpret a candidate's statement of party affiliation as a party's seal of approval.[97] And Kohlhaas has not presented any evidence to suggest they will.

The Treadwell amici again urge us not to follow *Washington State Grange* because the Alaska Constitution is more protective of political parties' associational interests than the federal constitution.[98] They argue that "[i]t is a substantial burden to force a party to see its brand associated with someone who is not a member."

The key question when analyzing this claim of forced association is, as Chief Justice John Roberts reasoned in his concurrence in *Washington State Grange*, "whether voters *perceive* the candidate and the party to be associated."[99] "Voter perceptions matter," he explained, "and if voters do not actually believe the parties and the candidates are tied together, it is hard to see how the parties' associational rights are adversely implicated."[100] There is no question that display of party affiliation on the ballot is significant because of "the effect it has on voter impressions."[101] But "[i]f the ballot [were] designed in such a manner that no reasonable voter would believe that the

---

[96]    AS 15.15.030(14); AS 15.15.060(e).

[97]    *Cf. Alaska Democratic Party*, 426 P.3d at 913 ("We are confident the Division of Elections will be able to design a ballot that voters can understand. . . . The ballot could include prominent disclaimers explaining that a candidate's party affiliation denotes only the candidate's voter registration and nothing more.").

[98]    *Id.* at 909.

[99]    552 U.S. at 459 (Roberts, C.J., concurring) (emphasis in original).

[100]    *Id*. at 460.

[101]    *Id.*

candidates listed there are nominees or members of, or otherwise associated with, the parties the candidates claimed to 'prefer,' . . . [Washington's] primary system would likely pass constitutional muster."[102] "Voters would understand that the candidate does not speak on the party's behalf or with the party's approval."[103] Chief Justice Roberts concluded that the facial challenge to the law failed because the challengers had not shown it was impossible to design a ballot that would avoid misleading voters.[104]

Kohlhaas and the Treadwell amici fall short in similar fashion here. True, the Alaska Constitution is more protective of associational rights than the federal constitution. But a party arguing that an election law violates the Alaska Constitution must still show that the law burdens these rights. Kohlhaas and the Treadwell amici presented no evidence that displaying candidates' party registration on the ballot creates a meaningful risk of confusing voters. And unless voters will be tricked into perceiving an association that does not exist, there is scant burden on a party's associational rights.

### 3. Initiative 2's nonpartisan open primary advances important regulatory interests.

Having determined that Initiative 2 places only a minor burden on parties' associational rights, we now examine the fit between the legislation and the interest it is said to advance. Because all "[e]lection laws will invariably impose some burden upon

---

[102]   *Id.*

[103]   *Id.* at 461.

[104]   *Id.* at 460-61.

individual voters,"[105] "states must be granted some leeway."[106] "[M]odest or minimal burdens require only that the law is reasonable, non-discriminatory, and advances 'important regulatory interests.' "[107]

> The ballot for Initiative 2 described the intent behind the open primary:

> It is in the public interest of Alaska to adopt a primary election system that is open and nonpartisan, which will generate more qualified and competitive candidates for elected office, boost voter turnout, better reflect the will of the electorate, reward cooperation, and reduce partisanship among elected officials.[108]

The State asserts that allowing candidates to designate their party registrations provides voters with relevant information about the candidates they are choosing between. Kohlhaas dismisses these interests as "just words and the speculation of the persons who wrote the initiative."

We have held similar interests important and legitimate in the primary election context. In *O'Callaghan v. State* we upheld Alaska's previous "blanket primary" system against a challenge based on political parties' associational rights.[109] In the blanket primary, candidates from all parties were listed on a single ballot that was

---

[105] *O'Callaghan v. State*, 914 P.2d 1250, 1253 (Alaska 1996) (quoting *Burdick v. Takushi*, 504 U.S. 428, 433-34 (1992)).

[106] *State, Div. of Elections v. Green Party of Alaska*, 118 P.3d 1054, 1059 (Alaska 2005); *see also Wash. State Grange*, 552 U.S. at 452 ("[W]e have repeatedly upheld reasonable, politically neutral regulations that have the effect of channeling expressive activity at the polls." (quoting *Burdick*, 504 U.S. at 438)).

[107] *State v. Alaska Democratic Party*, 426 P.3d 901, 909 (Alaska 2018) (quoting *O'Callaghan*, 914 P.2d at 1254).

[108] Alaska Ballot Initiative 2, § 1(4) (2020) (statement of findings and intent).

[109] 914 P.2d at 1263.

given to all primary voters.[110] A voter could cast a single vote for any party's candidate, regardless of that voter's own party registration.[111] The top vote recipient for each party was the party's nominee for the general election.[112] After determining that the blanket primary placed only a modest burden on political parties' associational rights, we decided that the system was justified by the "legitimate and important" interests of encouraging voter turnout, maximizing voters' choices of candidates, and ensuring elected officials are representative of their constituencies.[113]

The U.S. Supreme Court later ruled in *California Democratic Party v. Jones* that California's similar blanket primary system was unconstitutional.[114] The Court ruled that the blanket primary placed a severe burden on parties' associational rights and therefore had to be narrowly tailored to advance compelling governmental interests.[115] The Court explained that two of the interests put forward to justify the law

---

[110]     *Id.* at 1255.

[111]     *Id.*

[112]     For purposes of our analysis, the key difference between a blanket primary system, like the one Alaska used to use, and the open nonpartisan primary system adopted by Initiative 2, is that the former system chooses the parties' nominees for office, while the latter system does not. *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 451, 453 (2008) (distinguishing California's blanket primary struck down in *California Democratic Party v. Jones*, 530 U.S. 567 (2000) from Washington's nonpartisan open primary by pointing out that under the latter system "[t]he essence of nomination — the choice of a party representative — does not occur").

[113]     *O'Callaghan*, 914 P.2d at 1261-63.

[114]     530 U.S. 567 (2000).

[115]     *Id.* at 581-82 (explaining that California's blanket primary "forces [parties] to adulterate their candidate-selection process . . . by opening it up to persons wholly unaffiliated with the party," with the "likely outcome . . . of changing the parties'
(continued...)

— "producing elected officials who better represent the electorate and expanding candidate debate beyond the scope of partisan concerns" — were not legitimate at all.[116] Instead the Court characterized them as "simply circumlocution for producing nominees and nominee positions other than those the parties would choose if left to their own devices," "nothing more than a stark repudiation of freedom of political association."[117] Other asserted interests — including affording voters greater choice and increasing voter participation — were not similarly suspect, but the Court concluded they were not compelling in the context of the case and did not justify the blanket primary's severe burden on associational rights.[118]

Jones calls into question the legitimacy of some, but not all, of the interests put forward to justify Initiative 2's nonpartisan open primary.[119] Although the Court

---

[115]　(...continued)
message," concluding there was "no heavier burden on a political party's associational freedom").

[116]　Id. at 582.

[117]　Id.

[118]　Id. at 584-85.

[119]　We question whether the Supreme Court's view that the goal of producing elected officials with wider support among the electorate is an illegitimate goal and a "stark repudiation of freedom of political association" holds true when the primary system is entirely decoupled from a political party's process of choosing its own nominees. Under the blanket primary system struck down by the Court, the primary election determined each party's nominee for the general election. Id. at 570. The governmental objective of changing the type of candidate that would become the party's nominee was therefore antithetical to the party's ability to make that choice itself. But Initiative 2's nonpartisan primary election process does not determine political parties' nominees. Within this context, structuring the primary election process so that advancing candidates better represent the entire electorate — i.e. are more acceptable to

(continued...)

concluded that increasing voter turnout and voters' choice of candidates could not support a severe burden on associational rights, its holding does not undermine our conclusion in *O'Callaghan* that these interests are important and legitimate. These interests may still justify a modest burden on associational rights. And the Supreme Court concluded that displaying candidates' party registration on the ballot is justified by the important goal of providing relevant information to voters.[120]

In lieu of trying to show that Initiative 2 fails to advance these interests, Kohlhaas makes a series of irrelevant arguments. First, he argues that Initiative 2's sponsors specifically intended to abolish the party primary system. But that intent is simply the means to the ends described above and does not negate the legitimacy of those goals. And as explained above, decoupling the primary election from the parties' own nominating process does not burden parties' associational rights.[121]

Second, he argues that the campaign supporting Initiative 2 focused on the supposedly more-popular dark money disclosure provision and the law nonetheless passed by a narrow margin. To the extent he is arguing that it was improper to combine

---

[119] (...continued)
more voters — seems entirely legitimate. *Cf. id.* at 572 ("[I]n order to avoid burdening the general election ballot with frivolous candidacies, a State may require parties to demonstrate 'a significant modicum of support' before allowing their candidates a place on that ballot." (quoting *Jenness v. Fortson*, 403 U.S. 431, 442 (1971))). In fact, ensuring that an election produces a winner most acceptable to the electorate is a basic premise of democracy. Because the parties do not address the issues raised by *Jones*, and because Initiative 2's nonpartisan open primary is supported by other important regulatory interests, we need not conclusively decide this point.

[120] *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 458 (2008).

[121] *Cf. id.* at 453 ("Whether parties nominate their own candidates outside the state-run primary is simply irrelevant.").

these election reforms in a single ballot initiative, we rejected that argument in *Meyer v. Alaskans for Better Elections*, holding that Initiative 2 did not violate the Alaska Constitution's requirement that all non-appropriation bills "be confined to one subject."[122]  To the extent he is arguing that Initiative 2's changes to the primary and general elections would not have passed without being combined with campaign finance reforms, that is irrelevant to the constitutionality of those changes.

Kohlhaas's third argument is equally irrelevant: that a top-four nonpartisan primary is not used anywhere else and that "Alaska should not be used as an experiment."  That is a policy argument, not a legal one.

Finally, he argues that similar initiatives were rejected for the ballot in North Dakota and Arkansas.  These cases are not on point because those ballot initiatives were rejected for procedural reasons, not because of the substance of those laws.[123]

Neither Kohlhaas nor the Treadwell amici seriously argue that the nonpartisan primary does not advance to at least some degree the interests put forward to justify it.[124]  In a state where most voters identify as undeclared or nonpartisan,[125] it is

---

[122]    465 P.3d 477, 482, 499 (Alaska 2020) (applying Alaska Const. art. II, § 13).

[123]    *Haugen v. Jaeger*, 948 N.W.2d 1, 3-4 (N.D. 2020) (holding petition did not comply with the state constitutional requirement that it contain the measure's full text); *Ark. Voters First v. Thurston*, No. CV-20-454, 2020 WL 5056585, at *1-2 (Ark. Aug. 27, 2020) (holding that law's supporters failed to verify that their paid canvassers had passed criminal background checks as required by law).

[124]    The Treadwell amici argue only that the nonpartisan primary places a severe burden on associational rights and fails strict scrutiny; they do not argue that, if the burden on associational rights is only minor, the law is nonetheless unconstitutional.

[125]    *E.g.*, STATE OF ALASKA DIV. OF ELECTIONS, *Number of Registered Voters by Party Within Precinct*, (Sept. 3, 2020) https://www.elections.alaska.gov/statistics/
(continued...)

certainly plausible that allowing any person to run in the primary election and appeal to the entire spectrum of registered voters — not just to voters of a specific party — will encourage more candidates to run and boost voter turnout. Kohlhaas and the Treadwell amici have not presented any evidence showing otherwise. They therefore have failed to meet their burden in this facial challenge to show that the nonpartisan primary lacks a "plainly legitimate sweep."[126]

**B.** **Initiative 2's Nonpartisan Open Primary Does Not Violate The Alaska Constitution's Provision For Electing The Lieutenant Governor.**

Kohlhaas argues that Initiative 2 violates article III, section 8 of the Alaska Constitution, which provides:

> The lieutenant governor shall be nominated in the manner provided by law for nominating candidates for other elective offices. In the general election the votes cast for a candidate for governor shall be considered as cast also for the candidate for lieutenant governor running jointly with him. The candidate whose name appears on the ballot jointly with that of the successful candidate for governor shall be elected lieutenant governor.

Kohlhaas seems to misread Initiative 2 to preclude governor and lieutenant governor candidates from running together.[127] To the contrary, the law requires candidates for

---

[125]    (...continued)
2020/SEP/VOTERS%20BY%20PARTY%20AND%20PRECINCT.htm (showing 57.7% of registered voters as nonpartisan or undeclared).

[126]    *State v. Planned Parenthood of the Great Nw.*, 436 P.3d 984, 991-92 (Alaska 2019).

[127]    He argues: "The joint candidacy required for the Constitution for the general election cannot be created under Proposition 2. Two candidates running as a team in the primary election is not authorized or mandated under Proposition 2."

governor and lieutenant governor to run together on both the primary and general election ballots.[128]

The Treadwell amici make a different argument. They argue that because article III, section 8 requires lieutenant governor candidates to be "nominated in the manner provided by law for nominating candidates for other elective offices," lieutenant governor candidates must "run[] solo in a partisan primary on the same basis as candidates for other offices" before being paired with the gubernatorial candidate of the same political party on the general election ballot. According to this theory, Initiative 2, which pairs the governor and lieutenant governor candidates on a primary ballot, is unconstitutional.

"Our analysis of a constitutional provision begins with, and remains grounded in, the words of the provision itself."[129] "We are not vested with the authority to add missing terms or hypothesize differently worded provisions . . . to reach a particular result."[130] "We instead 'look to the plain meaning and purpose of the provision and the intent of the framers.' "[131] This includes "the Delegates' debates and statements

---

[128]    *See* AS 15.25.030(a)(16)-(17) (requiring governor and lieutenant governor candidates to list their running mate when filing for candidacy); AS 15.15.030(5) (mandating that "[t]he lieutenant governor and the governor shall be included under the same section" on the general election ballot); AS 15.25.060 (providing the same for the primary election ballot).

[129]    *Wielechowski v. State*, 403 P.3d 1141, 1146 (Alaska 2017) (quoting *Hickel v. Cowper*, 874 P.2d 922, 927 (Alaska 1994)).

[130]    *Id.* (alteration in original) (quoting *Hickel*, 874 P.2d at 927-28).

[131]    *Id.* (quoting *Hickel*, 874 P.2d at 926).

in interpreting the constitution"[132] as well as "the historical context, including events preceding ratification."[133] "Because of our concern for interpreting the constitution as the people ratified it, we generally are reluctant to construe abstrusely any constitutional term that has a plain ordinary meaning," and we give provisions "a reasonable and practical interpretation in accordance with common sense."[134]

Neither text nor history supports the argument that the constitution requires candidates for lieutenant governor to run solo in a partisan primary election. Article III, section 8 does not use the term "primary." The language it does use to describe nomination of candidates for lieutenant governor — "nominated in the manner provided by law" for other candidates — is broad enough to include other processes, such as party convention or gathering signatures. The proceedings of the constitutional convention confirm the lack of specificity: one delegate to the constitutional convention noted "it would probably be very unwise" to adopt a reference to party primaries in the lieutenant governor provision because "[t]here might not always be a primary" if the legislature changed the law to allow nominating conventions.[135] The language of article III, section 8 was deliberately left broad so that, in the words of one delegate, "the [lieutenant governor] would run as provided by law for all other candidates, and if they ever

---

[132]     *Forrer v. State*, 471 P.3d 569, 587 (Alaska 2020).

[133]     *Wielechowski*, 403 P.3d at 1147 (quoting *State v. Ketchikan Gateway Borough*, 366 P.3d 86, 90 (Alaska 2016)).

[134]     *Id*. at 1146 (quoting *Hickel*, 874 P.2d at 926).

[135]     3 Proceedings of the Alaska Constitutional Convention (PACC) 2044-45 (Jan. 13, 1956) (statement of Del. Victor Rivers).

abolished the system of primary election and went back to the convention system, [the] language would still be broad enough to make it flexible."[136]

Yet the kernel of the Treadwell amici's argument — that Initiative 2's nominating process for the lieutenant governor is constitutionally suspect because it is not exactly the same as the nominating process for other candidates — is not so easily dismissed. The key inquiry is just how precisely the manner of nominating the lieutenant governor must match the manner in which other candidates for elective office are nominated.

The constitutional text does not clearly answer this question. The phrase "in the manner" could reasonably be read to mean that lieutenant governor candidates must be nominated in *exactly* the same manner, but "exactly the same" is not the only common-sense reading of "in the manner." The constitutional text does not tell us whether the delegates intended that lieutenant governor candidates be elected in exactly the same manner or in the same general manner, with some flexibility to facilitate pairing with a compatible gubernatorial candidate on the general election ballot.

The constitutional history of article III, section 8 does not offer crystal-clear guidance either. What the history does suggest is that the delegates adopted a compromise provision — balancing the desire for a lieutenant governor to be meaningfully vetted by the voting public with the desire to ensure political compatibility with the governor — that was flexible enough to accommodate future changes the legislature (or the people) might make to the election system.

Article III, section 8 originated with a proposal from the delegates' Committee on the Executive Branch that did not mention how the lieutenant governor — originally called the secretary of state — was to be nominated, providing only for

---

[136]    3 PACC 2140 (Jan. 14, 1956) (statement of Del. Ralph Rivers).

election "at the same time and for the same term as the governor."[137] A ballot cast for a gubernatorial candidate was to be treated as a ballot cast for the secretary of state candidate "shown on the ballot as running jointly with" the gubernatorial candidate.[138] The proposal did not specify how this pairing was to be achieved. A delegate who served on the Committee on the Executive Branch explained that the system was designed to ensure that the secretary of state "would come from the same political party which the governor came from, so, in the manner in which the President and Vice President is elected, we selected the joint ballot type of thing."[139]

The delegates debated the proposal over two days and initially approved an amendment abolishing the proposal entirely — removing the secretary of state entirely from the constitution, leaving the matter to the legislature — before reconsidering.[140] Delegate Victor Rivers, who served on the Committee on the Executive Branch and presented the original proposal, ultimately offered an amendment "to effectuate the ideas submitted and discussed in Committee and on th[e] floor" during the

---

[137]    *See* Constitutional Convention Committee Proposal No. 10/a, § 6 (Jan. 12, 1956) ("There shall be a secretary of state, who shall have the same qualifications as the governor. He shall be elected at the same time and for the same term as the governor, and the election procedure prescribed by law shall provide that the electors, in casting their vote for governor shall also be deemed to be casting their vote for the candidate for secretary of state shown on the ballot as running jointly with the respective candidate for governor. The candidate for secretary of state who runs jointly with the successful candidate for governor shall be elected secretary of state.").

[138]    *Id.*

[139]    3 PACC 1985 (Jan. 13, 1956) (statement of Del. Victor Rivers).

[140]    *Id.* atPACC 2089-93; 3 PACC 2128, 2143 (Jan. 14, 1956).

two-day debate.[141]   This amendment was approved by a voice vote without any additional debate, becoming article III, section 8.[142]

It is clear from the convention history that the delegates wanted to guarantee that the governor and secretary of state would not work at cross-purposes, aiming to ensure they hailed from the same political party (and, ideally, the same faction of that party).[143]   And although some delegates wanted the governor to appoint the secretary of state to maximize the strength of the executive,[144] those delegates were outnumbered, with most preferring that the secretary of state be elected in some way.[145]

---

[141]   3 PACC 2144 (Jan. 14, 1956).

[142]   *Id.* at 2145; *see* Alaska Const. art. III, § 8 (amended 1970) ("The lieutenant governor shall be nominated in the manner provided by law for nominating candidates for other elective offices.  In the general election the votes cast for a candidate for governor shall be considered as cast also for the candidate for lieutenant governor running jointly with him.  The candidate whose name appears on the ballot jointly with that of the successful candidate for governor shall be elected lieutenant governor.").

[143]   *See, e.g.*, 3 PACC 1985-86 (Jan. 13, 1956) (statement of Del. Victor Rivers) ("In order to enforce and bulwark the strong executive, it was felt that we should provide some means by which [the secretary of state] would come from the same political party which the governor came from . . . ."); *id.* at 2081 (statement of Del. John Boswell) (arguing that "[t]he important thing . . . here" is that the governor and secretary of state be from the same political party); *id.* at 2087-89 (defeating amendment that would have elected governor and secretary of state separately, with Delegate John McNees noting it could result in election of candidates opposed to one another).

[144]   *Id.* at 2007 (statement of Del. Seaborn Buckalew) (questioning whether the state "would get a better secretary of state if the governor was allowed to appoint the secretary of state subject to approval by the senate"); *id.* at 2070 (statement of Del. John Hellenthal) (arguing delegates should "just let our governor hire someone to help him and fire him when he does not want him").

[145]   *Id.* at 2007 (statement of Del. Victor Rivers) (explaining it would be a
(continued...)

Because the delegates did not adopt the original proposal resembling the vice-presidential model and instead chose to require the lieutenant governor to be nominated in the manner of other elected officials, one can infer that the delegates wanted voters to have more power to choose a lieutenant governor than they have to choose the vice president under the federal constitution. If this was in fact the delegates' intent, Initiative 2 fulfills it.

Initiative 2 gives voters more power to choose lieutenant governor candidates by giving voters a say earlier in the process and by increasing the number of candidates to choose from. In the presidential election, a voter who votes for a successful candidate in the primary may be disappointed with that candidate's subsequent choice of vice president, but because of the limited options at the general election the voter is largely stuck with whomever the preferred presidential candidate has chosen. Under Initiative 2, Alaska voters will not be stuck with an unpleasant surprise. The voter knows in the primary election precisely who the gubernatorial candidate has chosen as a running mate. And because Initiative 2 does not limit the number of primary candidates, a voter is likelier to find more than a single gubernatorial candidate compatible with the voter's beliefs. The voter can therefore give weight to the choice of lieutenant governor candidate in the primary election, when the voter's options are not so limited. Although Initiative 2 does not give voters quite as much power to directly choose a lieutenant governor candidate as the prior system of partisan primaries did, it still gives voters more choice than the federal system.

---

[145]  (...continued) "disadvantage" if the governor's successor never faced an election and that the committee believed that "the people wanted an expression in the matter of just more than one individual"); 3 PACC 2135 (Jan. 14, 1956) (statement of Chair William Egan) (explaining he was "opposed to having the man who would be next in line in succession to the governorship not actually elected in some manner by the people of the new state").

The Treadwell amici argue that by pairing the governor and lieutenant governor candidates in the primary election, Initiative 2 creates a "buddy system" that delegates to the constitutional convention derided. This argument mischaracterizes the terms of the debate. Most of the delegates who used the term "buddy" or "flunky" were opposed to having the secretary of state elected at all.[146] They believed the governor should have the power to appoint the secretary of state for the sake of efficiency and competence.[147] These delegates feared that requiring the secretary of state to be elected in tandem with the governor would yield lieutenant governor candidates chosen for more political considerations than for ability or compatibility with the governor.[148] Those delegates lost the debate — the constitution requires the lieutenant governor to be elected together with the governor. Thus to the extent Initiative 2 adopts a "buddy" system, it is a system that the majority of delegates approved.

The previous system of partisan primaries that the Treadwell amici favor is no more faithful to the policies behind article III, section 8 than Initiative 2. A system in which candidates for lieutenant governor run solo in a party primary, as they did before Initiative 2, does give voters the power to nominate candidates for lieutenant governor independently of their preference for governor. But that virtue comes at the expense of the delegates' other priority: ensuring compatibility between governor and

---

[146] *See* 3 PACC 2081, 2089 (Jan. 13, 1956) (statement of Del. Seaborn Buckalew); *id.* at 2070 (statement of Del. John Hellenthal); 3 PACC 2128-29 (Jan. 14, 1956) (same).

[147] *See* 3 PACC 2067 (Jan. 13, 1956) (statement of Del. Seaborn Buckalew); *id.* at 2070 (statement of Del. John Hellenthal); 3 PACC 2142 (Jan. 14, 1956) (statement of Del. Seaborn Buckalew).

[148] *See* 3 PACC 2004, 2067 (Jan. 13, 1956) (statements of Del. Seaborn Buckalew); *id.* at 2070 (statement of Del. John Hellenthal).

lieutenant governor. There is no guarantee that nominees of the same party, elected separately, will be ideologically or temperamentally compatible. Initiative 2's system of pairing candidates for governor and lieutenant governor in the primary election is far more likely to achieve that result. In short, although Initiative 2 effects a different *balance* between the delegates' conflicting goals of compatibility and independent electoral legitimacy than a partisan primary, neither system is inherently more faithful to the delegates' goals.

Also important to the delegates was to craft a provision that would allow the legislature flexibility in structuring elections. Delegate Victor Rivers, responsible for both the original and final proposals, stated:

> [I]t would probably be very unwise to pinpoint in the constitutional section here a method of conducting elections such as set up that the primary shall do this or that. There might not always be a primary. There might be some time when nominating conventions will be reverted to as they are in some states.[149]

The responsibility "to make a fair and just manner of nominating" governor and secretary of state candidates, he added, should be "left up to the legislature."[150] Delegate Thomas Harris, who also served on the Committee on the Executive, explained that its members were concerned primarily with the line of gubernatorial succession and had "not set any definite rules of how [governor and secretary of state candidates] are to be tied up on the ticket. That is to be done later on by the legislature."[151] And Delegate Ralph Rivers, describing the amendment that would become article III, section 8, stated that "[t]he

---

[149] *Id*. at 2044-45 (statement of Del. Victor Rivers).

[150] *Id*. at 2045.

[151] *Id.* at 2070-71 (statement of Del. Thomas Harris).

secretary of state would run as provided by law for all other candidates, and if they ever abolished the system of primary election and went back to the convention system, [the] language would still be broad enough to make it flexible."[152]

This history — revealing delegates' competing goals of compatibility and independent electoral legitimacy and their desire to adopt a flexible framework — does not favor interpreting article III, section 8 to mean that the lieutenant governor must be nominated in the *exact same* manner as other elected officials. Such a strict reading would mean that a compromise provision governing a single office restricts the legislature's flexibility to design the elections process for all other elected state officials. Article III, section 8 requires the lieutenant governor to appear jointly with the governor on the general election ballot. Yet the Treadwell amici's strict reading allows no flexibility to accomplish that command. For example, prior to the enactment of Initiative 2 Alaska law permitted candidates to reach the general election ballot by collecting a sufficient number of signatures from registered voters.[153] To accommodate the need to pair lieutenant governor and governor candidates for the general election, the law required lieutenant governor and governor candidates to petition for signatures as a joint ticket, while all other candidates petitioned solo.[154] If Treadwell amici are correct that article III, section 8 requires the lieutenant governor to be nominated in exactly the same manner as all other candidates, then this system (which was the law in Alaska for

---

[152]    3 PACC 2140 (Jan. 14, 1956) (statement of Del. Ralph Rivers).

[153]    Ch. 83, §§ 5.51-.56, SLA 1960.

[154]    *See* former AS 15.25.180(a)(17) (2020) (repealed Feb. 28, 2021) (requiring only gubernatorial candidates to list the name of their running mate on nominating petition).

almost 60 years) cannot be used for any elective office. We doubt that the delegates intended the tail to wag the dog in this way.

Furthermore, the Treadwell amici's interpretation raises constitutional concerns. If the Treadwell amici are correct that the only permissible way under article III, section 8 to pair lieutenant governor and governor candidates for the general election is for these candidates to seek nomination solo through a party primary (or convention), then political parties offer the only route to the general election. Yet the U.S. Supreme Court has signaled that election laws cannot make political parties the sole gatekeepers of elected office.[155] "[T]he primary values protected by the First Amendment . . . are served when election campaigns are not monopolized by the existing political parties."[156] The Treadwell amici's interpretation of article III, section 8, entails precisely this kind of constitutionally suspect monopoly.

Considering the constitution's text, the convention proceedings, legislative practice, and the constitutional concerns with the Treadwell amici's argument, we conclude that the Alaska Constitution does not require the nomination process for the lieutenant governor to be exactly the same as that for every other elected official. Because Initiative 2 requires candidates for lieutenant governor to seek election through a nonpartisan primary like all other state elected officials, it satisfies the constitutional command that candidates for lieutenant governor be nominated "in the manner provided by law for nominating candidates for other elected offices."

---

[155] *See Anderson v. Celebrezze*, 460 U.S. 780, 794, 805-06 (1983) (invalidating law prescribing early filing deadline for independent presidential candidates because it "discriminate[d] against those candidates and — of particular importance — against those voters whose political preferences lie outside the existing political parties").

[156] *Id.* at 794.

**C.    Initiative 2's Ranked-Choice Voting Provisions Do Not Violate The Alaska Constitution's Provision For Electing The Governor.**

Article III, section 3 of the Alaska Constitution provides: "The governor shall be chosen by the qualified voters of the State at a general election. The candidate receiving the greatest number of votes shall be governor." Kohlhaas and the Treadwell amici argue that Initiative 2's system of ranked-choice voting conflicts with this constitutional command because it requires a candidate for governor to obtain a majority of votes, not merely the greatest number of votes, to win the general election. This argument rests on two false premises: first, that Initiative 2 requires a winning candidate to receive a majority of votes; and second, that Initiative 2 entails multiple rounds of voting akin to a series of runoff elections and therefore denies victory to the candidate who wins the greatest number of votes in the first round of voting.

**1.    Initiative 2 does not require a candidate to receive a majority of votes in order to win the general election.**

Kohlhaas's starting point is correct: the constitution does not require a candidate for governor to receive a majority of votes in order to win the election. Instead the candidate wins by receiving "the greatest number of votes" — meaning a candidate can win with a plurality of votes.[157]

The record of the constitutional proceedings confirms this straightforward interpretation of the text.[158] The delegates knew that most states used plurality systems so that elections would have a winner even if no candidate received a majority of

---

[157]    *See Plurality*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "plurality" as "[t]he greatest number (esp. of votes), regardless of whether it is a majority, simple, or absolute").

[158]    *See Wielechowski v. State*, 403 P.3d 1141, 1146 (Alaska 2017) (explaining that we "look to the . . . purpose of the provision and the intent of the framers" in interpreting the Alaska Constitution).

votes.[159] The initial proposal, nearly identical to the current version, provided: "The governor shall be elected by the qualified voters of this state. The person receiving the greatest number of votes shall be the governor . . . ."[160] During debate on the provision, Delegate George Sundborg suggested the second sentence was redundant and proposed its deletion.[161] Delegate Katherine Nordale objected, explaining that "if you leave this to the legislature they could say that the candidate receiving a majority of the votes cast" is the winner, and "it is conceivable that there may be three tickets in the field for governor."[162] Delegate Frank Barr agreed with Nordale, explaining that while some states require a majority and others require "the highest number of votes" to elect a governor, "in case there are more than two candidates that complicates the question" and the language Sundborg proposed deleting "solves it right here."[163] Sundborg's proposal to remove the second sentence was defeated by voice vote.[164] The delegates adopted a plurality requirement to avoid the experience of states with constitutions requiring a candidate to receive a majority of votes cast, which often saw elections with no winner when more than two candidates were on the ballot.[165]

---

[159] 2 ALASKA STATEHOOD COMM., CONSTITUTIONAL STUDIES, ch. IV, at 4 (1955).

[160] Constitutional Convention Committee Proposal No. 10/a, § 3 (Jan. 12, 1956).

[161] 3 PACC 2065 (Jan. 13, 1956) (statement of Del. George Sundborg).

[162] *Id*. at 2065-66 (statement of Del. Katherine Nordale).

[163] *Id*. at 2066 (statement of Del. Frank Barr).

[164] *Id.*

[165] *See id.* at 2065-66. For example, a congressional seat in Massachusetts
(continued...)

Where Kohlhaas and the Treadwell amici go wrong is in arguing that Initiative 2's system of ranked-choice voting *requires* a candidate to receive a majority of votes in order to win. It does not. It is entirely possible for a candidate to win an election by receiving less than a majority of total votes cast. For example, the Treadwell amici point to a recent congressional election in Maine conducted with ranked-choice voting. They maintain that the candidate ultimately declared the victor was in second place with 45% of the vote after the initial round of counting, but received 50.62% of votes counted in the final round against his opponent's 49.38%. This is true, but the winning candidate received only 49.2% of the total votes cast — winning with slightly less than a majority, but still the greatest number, of votes cast.[166]

To understand how a candidate can win without a majority of votes, it is helpful to revisit how ranked-choice voting works. Under Initiative 2, voters may rank general election candidates in order of preference.[167] The Division of Elections initially tabulates each ballot as a vote for the highest-ranked candidate; if a candidate has more than half of these votes, counting is complete and that candidate wins.[168] If not, the candidate with the fewest votes is eliminated, and each ballot that had been counted for the eliminated candidate is reassigned to the voter's second-choice candidate on the

---

[165] (...continued)
remained vacant for an entire two-year term because is took 12 elections until one candidate obtained a majority, and in Vermont it took 10 runoff elections to fill a congressional seat. *See generally* Richard H. Pildes & G. Michael Parsons, *The Legality of Ranked-Choice Voting*, 109 CAL. L. REV. 1773, 1788-95 (2021) (detailing the history of majority provisions).

[166] *See Baber v. Dunlap*, 376 F. Supp. 3d 125, 130-31 (D. Me. 2018).

[167] *See* AS 15.15.350(c)-(e); AS 15.15.360(a)(1).

[168] AS 15.15.350(d).

ballot.[169] If the ballot does not rank a second-choice candidate, it is considered "inactive" and is not counted in further tabulations.[170] This process repeats until only two candidates remain, when the candidate "with the greatest number of votes is elected."[171]

The flaw in Kohlhaas and the Treadwell amici's argument is in assuming that votes for losing candidates are always redirected to successful candidates, so that a candidate must ultimately receive more than half the total votes cast in order to win. But they fail to appreciate the fact that voters do not have to select second- or third-choice candidates, and many may not. When a voter's first-place candidate is eliminated and the voter has not ranked a second-place candidate, the ballot is not redirected to another candidate. Because these votes do not go into the numerator (votes for a successful candidate) but remain in the denominator (total votes cast), a successful candidate can win the election with less than half of the total votes cast even though the candidate receives more than half of the votes counted in the final round of tabulation.

A simple example shows how a candidate can prevail without a majority of votes. Consider an election with four candidates, in which 100 people vote. Candidates Alpha, Bravo, Charlie, and Delta receive 30, 25, 25, and 20 first-place votes, respectively. The last-place candidate, Delta, is eliminated. The twenty ballots initially counted for Delta are reexamined. Ten of these ballots did not rank a second-choice candidate, so these ballots are inactive.[172] The remaining ten did rank a second-choice candidate — five for Alpha, and five for Bravo — and are added to those candidates' totals, resulting in totals of 35, 30, and 25 for Alpha, Bravo, and Charlie respectively.

---

[169] *Id.*

[170] AS 15.15.350(d)(2), (g)(2).

[171] AS 15.15.350(d).

[172] *See* AS 15.15.350(g)(2).

Because Charlie is now in last place, Charlie is eliminated.[173] Ten of Charlie's ballots ranked Alpha next, ten ranked Bravo next, and five did not rank another candidate. When the votes are tabulated again, the final total is 45 for Alpha, 40 for Bravo, and 15 ballots exhausted. Although Alpha has received a majority of the ballots that are *active* (i.e. counted) in the final round (45/85), Alpha has received only a plurality of the *total* ballots cast (45/100).[174] Therefore a candidate does not need to receive a majority of votes cast to win a ranked-choice election and can win by receiving merely "the greatest number of votes," consistent with the text of article III, section 2.

Finally, it is important to note that Initiative 2's system of ranked-choice voting does not contravene the purpose behind article III, section 2: eliminating the risk of an election with no winner. Except in the rare instance of a tie, ranked-choice voting will always produce a winning candidate because it does not require a candidate to surpass a particular vote threshold.

### 2. Initiative 2 does not deny victory to the candidate receiving the greatest number of votes.

Kohlhaas and the Treadwell amici make a second argument why they believe ranked-choice voting violates article III, section 2. They contend that because the candidate who receives the greatest number of first-choice votes does not automatically win the election and may ultimately lose after second- and third-choice votes are tallied, ranked-choice voting unconstitutionally denies victory to the candidate who received "the greatest number of votes." They maintain that ranked-choice voting

---

[173] *See* AS 15.15.350(d).

[174] *See Dudum v. Arntz*, 640 F.3d 1098, 1111 (9th Cir. 2011) (explaining that under ranked-choice voting "a plurality of the *total* votes cast can prevail, as the majority is only of the last stage of calculation, when many candidates have been mathematically eliminated" (emphasis added)).

is akin to a series of runoff elections that the delegates implicitly rejected by providing for election by a plurality of votes.

The Treadwell amici rely heavily on an advisory opinion of the Maine Supreme Judicial Court, which ruled that the system of ranked-choice voting adopted in Maine violated that state's constitution.[175] Maine's system worked similarly to that adopted in Initiative 2, eliminating the last-place finisher and redistributing ballots initially counted for that candidate according to voters' preferences until a candidate achieved an outright majority or all ballots were exhausted.[176] The Maine Supreme Judicial Court noted that the Maine constitution's original requirement that a winner receive a majority of votes was changed to a plurality requirement following a history of failed elections due to the lack of outright majority.[177] Proceeding through the ranked-choice voting algorithm, the court reasoned, meant that the law "prevent[ed] the recognition of the winning candidate when the first plurality [wa]s identified" — after the first-place votes were recorded.[178] It explained that "[i]f, after one round of counting, a candidate obtained a plurality of the votes but not a majority, that candidate would be declared the winner according to the Maine Constitution . . . . According to the [ranked-choice voting law], however, that same candidate would not then be declared the

---

[175] *Opinion of the Justices*, 162 A.3d 188, 211 (Maine 2017).

[176] *Id.* at 204.

[177] *Id.* at 209-11.

[178] *Id.* at 211.

winner."[179]  As a result, the court found the ranked-choice voting law violated Maine's constitution.[180]

But the Maine Supreme Judicial Court did not explain why its constitution required the election to be called after "one round of counting."[181]  If the vote count is not final after the first round of tabulation, then the candidate in first place after the first round is not necessarily the candidate "receiving the greatest number of votes."  Instead that candidate is simply the candidate in the lead before the votes have been fully counted.

With ranked-choice voting, the vote count is not final after the first round of tabulation.  Maine's law provided that if there were more than two candidates left "the last-place candidate [wa]s defeated and a new round [of tabulation] beg[an]," repeating until two candidates remained and the candidate with the most votes was declared the winner.[182]  Similarly, Initiative 2 specifies that the tabulation "continues" until two or fewer candidates remain and "the candidate with the greatest number of votes is elected and the tabulation is complete."[183]  According to both states' ranked-choice voting laws, the vote count is not complete until the final round of tabulation.[184]  Yet the Maine Supreme Judicial Court treated the result obtained after the first round of counting as if it were final, without pointing to any text in its constitution that requires

---

[179]    *Id.*

[180]    *Id*.

[181]    *See id*.

[182]    Former ME. STAT. tit. 21-A, § 723-A(2) (2017) (amended Sept. 19, 2019).

[183]    AS 15.15.350(d)(1).

[184]    *See id.*; former ME. STAT. tit. 21-A, § 723-A(2) (2017) (amended Sept. 19, 2019).

votes to be counted in that way or that limits the way a vote can be cast or expressed.[185] The court discussed at length the history of the Maine constitution's plurality provision and the state's history of failed elections but did not explain how ranked-choice voting is any more likely to result in a failed election than single-choice voting.[186] The court's failure to pinpoint constitutional text, structure, or policies inconsistent with ranked-choice voting leaves us unconvinced by its analysis.

A more persuasive account of how ranked-choice voting works was described by the Ninth Circuit Court of Appeals in *Dudum v. Arntz*.[187] That case concerned San Francisco's system of restricted instant-runoff voting ("restricted IRV"), a variant of ranked-choice voting, for certain municipal offices.[188] Like Alaska's Initiative 2, San Francisco's law allowed voters to rank candidates by preference.[189] The Ninth Circuit rejected the notion that the tally after the first round of counting — i.e., after first-choice votes have been tallied and before second-choice votes are tallied — was "final" or significant in any way.[190]

The Ninth Circuit described as "off the mark" the challengers' argument (which was similar to the logic of the Maine Supreme Judicial Court) that each round of

---

[185]    *See Opinion of the Justices*, 162 A.3d at 211.

[186]    *See id.* at 209-11.

[187]    640 F.3d 1098 (9th Cir. 2011).

[188]    *Id.* at 1100-01. The system was considered "restricted" because the law permitted limiting voters' rankings to three candidates if the voting equipment could not accommodate a greater number. *Id.* at 1101.

[189]    *Id.*

[190]    *See id.* at 1107.

vote *tabulation* is a separate round of *voting*, so that the system is akin to a series of runoff elections:

> In actuality, all voters participating in a restricted IRV election are afforded a single and equal opportunity to express their preferences for three candidates; voters can use all three preferences, or fewer if they choose. Most notably, once the polls close and calculations begin, no new *votes* are cast. To determine the winner of the election based on that single set of votes cast, restricted IRV uses an algorithm. The ballots, each representing three or fewer preferences, are the initial inputs; the sequence of calculations mandated by restricted IRV is used to arrive at a single output — one winning candidate.[191]

The court concluded that "[t]he series of calculations required by the algorithm to produce the winning candidate are simply steps of a single tabulation, not separate rounds of voting."[192] It contrasted San Francisco's system with a true runoff election: one in which the top candidates from the first ballot advance to a second ballot, which "involves at least two rounds of voting, or *inputs*."[193] While a true runoff election requires voters to head to the polls twice and cast two different ballots, ranked-choice voting, the court explained, "considers only one round of inputs, i.e., votes."[194]

The Ninth Circuit's explanation that ranked-choice voting entails only a single round of voting, tabulated with a series of calculations, is more persuasive than the Maine Supreme Judicial Court's view that the system involves a series of separate

---

[191]     *Id*. (emphasis in original) (footnote omitted).

[192]     *Id. Dudum*'s "single tabulation" language is somewhat different from the language of Initiative 2, which notes that "tabulation proceeds in sequential rounds" until "the tabulation is complete." AS 15.15.350(d). Functionally, these systems are identical.

[193]     *Dudum*, 640 F.3d at 1107 (emphasis in original).

[194]     *Id.*

elections. An election result is not "final" under ranked-choice voting while election officials are still tallying voters' preferences; they must be tallied completely to determine which candidates have won, and the count is not complete until each vote has been given full effect. Once the vote is final, the candidate "receiving the greatest number of votes" is elected governor. Therefore, the fact that the candidate who receives the most first-place votes may not ultimately win the election does not violate the Alaska Constitution.

And there is no question that a ranked-choice vote is a single vote. Rankings reflect alternative votes, not multiple votes. A vote may start with Candidate Alpha, then be redirected to Candidate Bravo, and then be redirected again to Candidate Charlie, but in the end a person's vote will be tallied for no more than one candidate.

Nothing in the Alaska Constitution prohibits voting in this way. The constitution does not define or limit the term "vote." Black's Law Dictionary defines a vote as "[t]he expression of one's preference or opinion in a meeting or election by ballot, show of hands, or other type of communication."[195] A ranked-choice vote is an expression of preference that contains more information than a single-choice vote: I prefer Candidate Alpha best, but if Candidate Alpha cannot win, then I prefer Candidate Bravo to Candidate Charlie. Because a ranked-choice vote contains more information than a single-choice vote, it requires a more elaborate calculation to determine the winner. But it is still a single vote, cast by a single voter, that in the end is counted for a single candidate.

The delegates to the constitutional convention acknowledged that future legislatures may change how Alaska holds elections and left it to the legislature to

---

[195] *Vote*, BLACK'S LAW DICTIONARY (11th ed. 2019).

"prescribe[] by law" the "[m]ethods of voting" to be used.[196] They expressly contemplated the abolition of partisan primaries and left that choice to the legislature.[197] Although the delegates did not appear to contemplate ranked-choice voting, they clearly believed that the legislature and, by extension, the people, would have broad power to change the way Alaska's public officials are elected. The few guardrails they included

---

[196] Alaska Const. art. V, § 3 ("Methods of voting, including absentee voting, shall be prescribed by law. Secrecy of voting shall be preserved. The procedure for determining election contests, with right of appeal to the courts, shall be prescribed by law."). The Treadwell amici cite a 1961 opinion by Attorney General Ralph Moody for the idea that the legislature — and by extension voters via the initiative process — is not constitutionally permitted to undertake fundamental changes to election laws. 1961 FORMAL OP. ATT'Y GEN. 20. Moody was asked whether the legislature could require candidates in election districts with two or more representatives to seek election to a designated seat. *Id.* at 10. Moody drew a distinction between a "method of voting," which "concerns the mechanical way in which the voter exercises his choice[, such as] paper ballots, voting machines, polling places, and the like," and a "method of election," which "has to do with the manner of choosing officials." *Id.* at 12. The primary basis for this distinction was a textual contrast with a Florida constitutional provision addressing "method[s] of election." *Id.* at 11-12. Moody concluded that legislation requiring candidates to seek election to a designated seat within a district went "beyond 'methods of voting' in the sense that term appears to be used" in the Alaska Constitution, so the legislature had no power to enact the law. *Id.* at 12-13. Moody did not analyze the Alaska constitutional convention proceedings, acknowledge that the delegates contemplated future legislatures eliminating party primaries, or address the legislature's creation of a petition system, which was more like a method of election than a method of voting under his definition. The Attorney General's opinion does not persuade us that the delegates, in expressly providing for the legislature to prescribe methods of voting, intended to preclude the legislature from making changes to the system of elections.

[197] *See* 3 PACC 2044-45 (Jan. 13, 1956) (statement of Del. Victor Rivers (noting that "[t]here might not always be a primary" and referencing possibility of returning to nominating conventions); 3 PACC 2140 (Jan. 14, 1956) (statement of Del. Ralph Rivers) (acknowledging possibility that the legislature could "abolish[] the system of primary election and [go] back to the convention system").

in the constitution do not preclude adopting a way of tabulating votes that allows voters to provide more input about their preferences.

### D. Initiative 2's System Of Ranked-Choice Voting Does Not Unconstitutionally Burden The Right To Vote.

Finally, Kohlhaas argues that Initiative 2 "imposes an unconstitutional burden on the voter's right to make a knowledgeable choice between candidates." He asserts that with ranked-choice voting "the voter votes for his or her favorite choice, but for the second and later rounds the voter is voting blind." Kohlhaas takes issue with voters' inability to change their preferences in between rounds of tabulation. Although he does not explicitly say so, Kohlhaas essentially argues that Initiative 2 burdens the fundamental right to vote.[198]

We have already noted that election laws, including rules for voter registration and the time, place, and manner of voting, "will invariably impose some burden upon individual voters."[199] So long as the burden is modest, important State regulatory interests are typically sufficient to uphold a reasonable, nondiscriminatory state election law.[200]

The burden of ranked-choice voting on the individual right to vote is minimal, and not appreciably greater than the burden imposed by single-choice voting. Kohlhaas's complaint about the difficulty of casting a vote without knowing how others will vote is not unique to ranked-choice voting. Voters face the same basic problem in a single-choice voting system whenever there are more than two candidates. In that

---

[198] *See Miller v. Treadwell*, 245 P.3d 867, 868-69 (Alaska 2010) (describing fundamental right to vote).

[199] *O'Callaghan v. State*, 914 P.2d 1250, 1253-54 (Alaska 1996) (quoting *Burdick v. Takushi*, 504 U.S. 428, 433-34 (1992)).

[200] *Id.*

scenario voters often face a choice between voting for the candidate they prefer most or voting against the candidate they dislike most. Ranked-choice voting allows a voter to account somewhat for the uncertainty of others' behavior by permitting a choice of second- and third-place candidates.

Kohlhaas also argues that a voter whose ballot is "exhausted" during tabulation "has no input into the final decision . . . as if the voter did not participate in the election at all." But the same could be said of voters who support a third-party candidate under single-choice voting: a voter who votes for Candidate Charlie when the top two candidates are Candidates Alpha and Bravo is in essentially the same position. And with ranked-choice voting, a voter's ballot will be exhausted only if the voter has elected not to rank more than one candidate. Moreover, it is not accurate to say that such a voter has had no input in the outcome of the election. " '[E]xhausted' ballots *are* counted in the election[;] they are simply counted as votes for losing candidates, just as if a voter had selected a losing candidate in a plurality or runoff election."[201]

The minimal burden imposed by ranked-choice voting is justified so long as it advances important regulatory interests. The following interests were advanced in support of Initiative 2's proposal for ranked-choice voting:

> A ranked-choice voting system will help ensure that the values of elected officials more broadly reflect the values of the electorate, mitigate the likelihood that a candidate who is disapproved by a majority of voters will get elected, encourage candidates to appeal to a broader section of the electorate, allow Alaskans to vote for the candidates that most accurately reflect their values without risking the election of those candidates that least accurately reflect their values, encourage greater third-party and independent participation

---

[201] *Dudum v. Arntz*, 640 F.3d 1098, 1110 (9th Cir. 2011) (emphasis in original).

in elections, and provide a stronger mandate for winning candidates.[202]

The State's interests in allowing voters to express more nuanced preferences through their votes and to elect candidates with strong plurality support are important and legitimate regulatory interests,[203] and Kohlhaas has presented neither evidence nor a persuasive explanation to disprove the link between these goals and ranked-choice voting. Kohlhaas therefore failed to meet his burden of proving that the law lacks a plainly legitimate sweep.

Our conclusion finds support in the opinions of other courts. The Ninth Circuit in *Dudum* described the asserted burdens of San Francisco's ranked-choice voting system as "largely ephemeral, disappearing upon examination."[204] Accordingly the court ruled that the system was justified by the city's "legitimate interests in providing voters an opportunity to express nuanced voting preferences and electing candidates with strong plurality support."[205] The Minnesota Supreme Court upheld a city's system of ranked-choice voting, reasoning that challengers "failed to establish that [ranked-choice voting] on its face burdens the right to vote."[206] Even if ranked-choice voting "could be construed as a burden," the court reasoned, the burden was so slight as to be justified by the mere possibility that ranked-choice voting would advance the goals

---

[202]    Alaska Ballot Initiative 2, § 1(5) (2020) (statement of findings and intent).

[203]    *Dudum*, 640 F.3d at 1116.

[204]    *Id.* at 1113.

[205]    *Id.* at 1116.

[206]    *Minn. Voters All. v. City of Minneapolis*, 766 N.W.2d 683, 697 (Minn. 2009).

of greater turnout, less divisive campaigns, and greater minority representation.[207]  And the federal district court in Maine rejected a claim that an election under ranked-choice voting unconstitutionally burdened the right to vote, stating tartly that "a search for what exactly the burden is . . . is not a fruitful exercise."[208]

Kohlhaas fails to show that ranked-choice voting unconstitutionally burdens the right to vote.

## V.  CONCLUSION

We AFFIRM the superior court's grant of summary judgment.

---

[207]  *Id.* ("Reducing the costs and inconvenience to voters, candidates, and taxpayers by holding only one election, increasing voter turnout, encouraging less divisive campaigns, and fostering greater minority representation in multiple-seat elections are all legitimate interests for the City to foster.  Whether and to what degree implementation of [ranked-choice voting] will achieve those benefits remains to be seen.  But it is plausible that [ranked-choice voting] may advance one or more of these interests.  In the context of this facial challenge, that possibility is sufficient to justify any minimal burden imposed by [ranked-choice voting]." (footnote omitted)).

[208]  *Baber v. Dunlap*, 376 F. Supp. 3d 125, 145 (D. Me. 2018).